1   ARLENE B. MAYERSON (SBN 79310)
    *amayerson@dredf.org*
2   LARISA CUMMINGS (SBN 131076)
    *lcummings@dredf.org*
3   RAMAAH SADASIVAM (SBN 267156)
    *rsadasivam@dredf.org*
4   **DISABILITY RIGHTS EDUCATION
        AND DEFENSE FUND, INC.**
5   Ed Roberts Campus
    3075 Adeline Street, Suite 210
6   Berkeley, CA 94703
    Tel: +1.510.644.2555
7   Fax: +1.510.841.8645

8   [ADDITIONAL COUNSEL LISTED ON NEXT PAGE]

9   *Attorneys for Plaintiffs*

10              **UNITED STATES DISTRICT COURT**

11            **NORTHERN DISTRICT OF CALIFORNIA**

12  STUDENT A, by and through PARENT A, her          Case No.   3:17-cv-2510
    guardian; STUDENT B, by and through
13  PARENT B, his guardian; STUDENT C, by and        COMPLAINT FOR INJUNCTIVE AND
    through PARENT C, his guardian; and              DECLARATORY RELIEF FOR
14  STUDENT D, by and through PARENT D, her          VIOLATIONS OF THE INDIVIDUALS
    guardian, each one individually and on behalf of WITH DISABILITIES EDUCATION ACT,
15  all other similarly situated children,           20 U.S.C. §§ 1400, *et seq.*; SECTION 504 OF
                                                     THE REHABILITATION ACT OF 1973, 29
16                          Plaintiffs,              U.S.C. § 794; AMERICANS WITH
                                                     DISABILITIES ACT, 42 U.S.C. §§ 12131 *et*
17          v.                                       *seq.*; CALIFORNIA EDUCATION CODE §§
                                                     56000 *et seq.*
18  THE BERKELEY UNIFIED SCHOOL
    DISTRICT; DONALD EVANS, in his official          CLASS ACTION
19  capacity as the Superintendent for the Berkeley
    Unified School District; BEATRIZ LEYVA-
20  CUTLER, TY ALPER, JUDY APPEL, JOSH               JURY TRIAL DEMANDED
    DANIELS, and KAREN HEMPHILL, each in
21  his or her official capacity as a director of the
    Berkeley Unified School District Board of
22  Education; THE BOARD OF EDUCATION OF
    THE BERKELEY UNIFIED SCHOOL
23  DISTRICT,

24                          Defendants.

25

26

27

28

DEBORAH JACOBSON (SBN 278104)
*djacobson@jacobsoneducationlaw.com*
**JACOBSON EDUCATION LAW, INC.**
1919 Addison Street, Suite 105
Berkeley, CA 94704
Tel: +1.510.647.8125
Fax: +1.510.280.9340

SHANE BRUN (SBN 179079)
*sbrun@goodwinlaw.com*
BRENDAN E. RADKE (SBN 275284)
*bradke@goodwinlaw.com*
ANJALI MOORTHY (SBN 299963)
*amoorthy@goodwinlaw.com*
**GOODWIN PROCTER LLP**
Three Embarcadero Center
San Francisco, CA 94111
Tel: +1.415.733.6000
Fax: +1.415.677.9041

## INTRODUCTION

1.      Every day, students bound through classroom doors, backpacks and books in tow, full of endless potential.  They sharpen their pencils, take their seats,  and – perhaps unbeknownst to them – they place their future in the hands of their educators.  Accordingly, it is the urgent and ever-pressing responsibility of educators – teachers, schools, and school districts – to respect this tremendous act of trust.  And with the futures of young lives hanging in the balance, this responsibility begins by ensuring *all students* are provided the critical foundational tool that is the conduit to success – the ability to read.

2.      "All students" includes the students this case is brought on behalf of: children with reading disorders such as dyslexia ("reading disorders"), enrolled in Berkeley Unified School District ("BUSD.").  A large number of students have reading disorders.  It is estimated, for example, that 6% to 17%[1] of the population in the United States demonstrates some sign of dyslexia, making it by far the most prevalent learning disability.[2]  In California alone, it is estimated that more than 1 million students in K-12 public schools display some signs of dyslexia.[3]  Accordingly, in BUSD, which serves approximately 10,000 students,[4] reading disorders impact hundreds of students in any given school year.  Because reading disorders impact a vast student population, it's imperative that school districts, like BUSD, not only

---

[1] Jack M. Fletcher, *Dyslexia: The Evolution of a Scientific Concept*, 15(4)  J. of Int'l Neuropsychological Soc'y 501, 501 (July 2009).

[2] National Center for Learning Disabilities, The State of Learning Disabilities: Facts, Trends, and Emerging Issues 3,(3d Ed. 2014), *available at* https://www.ncld.org/wp-content/uploads/2014/11/2014-State-of-LD.pdf.  Among students who score in the bottom 30th percentile in basic reading skills, about 70-80% have dyslexia, 10-15% appear to be accurate readers but are too slow in word recognition and text reading, and another 10-15% appear to decode words better than they can understand the meaning of written passages.  Louisa Moats and Carol Tolman, *Types of Reading Disability*, READING ROCKETS, http://www.readingrockets.org/article/types-reading-disability (excerpted from Louisa Moats and Carol Tolman, Language Essentials for Teachers of Reading and Spelling (LETRS):  The Challenge of Learning to Read (Module 1) (Sopris West 2009).).

[3] *AB 1369 FAQ's*, Decoding Dyslexia CA (Revised Oct. 2016), http://decodingdyslexiaca.org/ab-1369-faqs/.

[4] *Berkeley Unified At a Glance*, Berkeley Unified School District (2017), http://www.berkeleyschools.net/about-the-district/berkeley-unified-at-a-glance/.

---

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF        CASE NO. 3:17-cv-2510

educate themselves as to what reading disorders are, but also as to how to timely identify and appropriately serve all students who have them.  As detailed throughout this Complaint, for years and years BUSD has systematically refused to do either.

3.     Reading disorders generally have a neurological basis.  Dyslexia, for example, is a serious reading disorder that is neurobiological in origin and is characterized by difficulties with word recognition and by poor spelling and decoding abilities.  However, like with all reading disorders, it is treatable.  Many children with reading disorders are incredibly bright and capable, but they must be taught to read in a different way than their typically developing peers.  So long as students with reading disorders are properly and timely identified, a variety of research-based reading interventions can be implemented to dramatically increase reading skill and performance.

4.     When students with reading disorders are identified early and provided the appropriate interventions and accommodations, they can progress through school with their peers and even excel.  The number of talented members of society we stand to lose because BUSD is simply unwilling to exert the time and resources necessary to identify students with reading disorders and provide the services and accommodations required for them to learn how to read is untenable.

5.     Moreover, if ignored or inappropriately treated, dyslexia can be devastating.  Even students who are extremely intelligent will fail to perform at grade level, quickly fall behind their peers, and ultimately accomplish much less than their potential otherwise permits.  Emotional consequences may also arise.  For example, undiagnosed and/or untreated reading disorders can lead to extreme frustration, aggravation, anxiety, depression, school avoidance and lifelong struggles.  By refusing to identify and serve its students with reading disorders, BUSD is failing these children on multiple fronts and the results are heartbreaking.

6.     These are the types of harms Plaintiffs either have experienced or are likely to experience and are seeking to remedy and prevent.  BUSD has systemically declined to timely identify, evaluate and provide appropriate interventions and accommodations to students with reading disorders, which are necessary tools required for them to process information and thereby attain the foundational unit of their education – to learn to read.  BUSD's failures are long-

standing, willful and egregious violations of Plaintiffs' most fundamental rights under federal and state laws and implementing regulations ensuring the right to a free appropriate public education ("FAPE").[5]

7.     Congress and the California legislature have mandated that children with reading disorders are entitled to special protections, to enhance their prospects of educational achievement.  Under IDEA and related state law, a child with at least one of the thirteen disabilities enumerated in the law may be entitled to special education and related services receive a FAPE.[6]  One of the eligible disabilities is a "specific learning disability" ("SLD"). Dyslexia, for example, a learning disability under which individuals have difficulty processing written language is specifically included in the definition of SLD.[7]

8.     Similarly, under Section 504 and ADA, a student is entitled to a FAPE if he or she "(i) has a physical or mental impairment which substantially limits one or more major life activities [such as learning or reading], (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment."[8]

9.     To receive a FAPE, students with disabilities due to reading disorders typically require special education, such as appropriately intensive research-based reading interventions,

---

[5] The relevant statutes and implementing regulations are: the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* ("IDEA"), and its implementing regulations at 34 C.F.R. Pt. 300, and related state law, California Education Code §§ 56000 *et seq.* ("Section 56000"), and its implementing regulations at Cal. Code Regs. tit. 5 §§ 3000 *et seq.*(2017); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), and its implementing regulations at 34 C.F.R. Pt. 104; and Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131 *et seq.* ("ADA"), and its implementing regulations at 28 C.F.R. Pt. 35.

[6] 20 U.S.C. § 1401(3)(A)(ii); Cal. Educ. Code § 56337(a).

[7] IDEA defines an SLD as "a disorder in 1 or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations."  20 U.S.C. § 1401(30)(A).  "Such term includes such conditions as perceptual disabilities, brain injury, minimal brain dysfunction, *dyslexia*, and developmental aphasia."  *Id.* § 1401(30)(B) (emphasis added); Cal. Educ. Code § 56337.  *See also* United States Department of Education Office for Special Education and Rehabilitative Services , *Dear Colleague Letter*, (Oct. 23, 2015), *available at* http://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/guidance-on-dyslexia-10-2015.pdf (affirming that school districts must allow for the use of the terms dyslexia, dyscalculia and dysgraphia in evaluation documents, Individualized Education Plans ("IEPs"), and other special education materials).

[8] 34 C.F.R. §§ 104.3(j), .33(a), .34(a); *see* 28 C.F.R. §§ 35.103(a), .108.

---

3

related services, supplementary aids and services, and curricular accommodations and modifications, such as accessible materials, assistive technology ("AT"), and changes to curriculum, ("special education and related aids and services") as provided by law.

10.     Federal and state laws require every California school district to provide students with disabilities with a non-discriminatory and free appropriate public education in the least restrictive environment ("FAPE in the LRE"). These laws and the corollary California law place specific obligations on BUSD to *timely* (1) identify schoolchildren who may have reading disorders, including children in early elementary school; respond appropriately to referrals for evaluation; (2) evaluate those children suspected to have reading disorders to determine their eligibility for special education and related aids and services; (3) provide children who have qualifying reading disorders the necessary special education and related aids and services so that they can make appropriate progress in the general education curriculum; and (4) continue to monitor and promote students' progress with meaningful parental involvement, by adhering to procedural safeguards, and providing timely periodic reviews and re-evaluations of students to effectively meet their learning needs.

11.     BUSD systematically fails to abide by these obligations. As a threshold problem, BUSD makes no coordinated effort to identify students with suspected reading disorders. Rather, BUSD generally treats all struggling readers the same, and takes insufficient steps to determine why they are struggling, *e.g.*, due to a reading disorder or some other reasons. The result of this one-size-fits-all approach is that students with reading disorders are not appropriately or timely identified, and, even when placed in reading programs that BUSD offers, they are not appropriately served. BUSD's reading programs are not designed for students with reading disorders, who typically struggle to decode words. Further, BUSD maintains policies and practices that, *inter alia*, actively discourage parents from requesting that BUSD evaluate children with reading difficulties until those children have fallen years behind their peers, often forcing those families to seek private evaluations at their own expense, if they can. BUSD also fails to train its educators to recognize and appropriately address reading disorders; and fails to ///

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF          CASE NO. 3:17-cv-2510

1    offer and provide special education and related aids and services necessary for students with

2    disabilities due to reading disorders to receive a FAPE in the LRE.

3          12.    These are systemic failures that relate to a very common condition faced by a large

4    population within BUSD and which have wrought a devastating and costly impact on students

5    and their families.  These students have found and/or will find themselves at worst functionally

6    illiterate as high schoolers, and at best reading several levels or more below the grade in which

7    they are enrolled, assuring they cannot access or benefit from relevant and grade-appropriate

8    curriculum.

9          13.    BUSD's most recent "Bi-Annual Report, Winter 2016" shows that while the

10   district's goal is that all students will read proficiently (*i.e.*, "satisfactorily") by third grade, only

11   70% of all third grade students read proficiently.[9]  For students who receive special education,

12   the outcomes are especially discouraging.[10]  BUSD's failures, detailed herein, are a major

13   contributor to these shortfalls.

14         14.    Plaintiffs and purported Class Members, all of whom are students who are or will

15   be enrolled in BUSD, like any other students, have goals of learning to read, graduating fully

16   literate, and seeking further education, employment, and independent living.  However, these

17   goals are essentially unattainable if Defendants continue to relegate these children to learning

18   conditions that manifestly fail the standards and criteria demanded by the law.  The named

19   Plaintiffs in this action are BUSD students with reading disorders who have tried to obtain

20   necessary special education and related aids and services from BUSD, especially appropriately

21   intensive research-based reading interventions and accommodations, but have been deprived of

22   access to these services because of Defendants' systemic refusals.  Defendants continuously fail

23   to provide Plaintiffs and other similarly situated students with a requisite FAPE in the LRE.

24   ///

25   _____

26   [9] Berkeley Unified School District, Berkeley Public Schools Bi-Annual Report 2 (Winter 2016), http://www.berkeleyschools.net/wp-content/uploads/2016/02/BUSDnews_Winter2016_Final.pdf.

27   [10] *See* California Department of Education,  English Language Arts Assessment Report for Berkeley Unified – Alameda County, (Spring 2017), *available at* California School Dashboard,

28   https://www.caschooldashboard.org/#/ReportDetail/01611430000000/1/6.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF          CASE NO. 3:17-cv-2510

15.     The deficiencies in Defendants' policies and practices with respect to reading disorders are long-standing and additionally well known to California Department of Education ("CDE") officials.  Despite receiving repeated notice about the damaging effect of their lack of appropriate policies and practices specific to reading disorders, and the associated breach of federal and state laws, Defendants have refused to institute necessary reforms.  Indeed, even though BUSD recently admitted that it is has not adequately served its students with dyslexia, it has gone a step further and directed schools *not* to evaluate students with suspected dyslexia unless and until it receives guidelines from CDE, which BUSD may not have until Fall 2017.  In short, Defendants have not only failed, they have actively condemned this class of students, as those before, to deprivation of their rights, ongoing academic struggle, social stigmatization, and a high risk of failure, over and over again.

16.     Plaintiffs bring this action on behalf of themselves and the hundreds of members of the Classes, defined below, for declaratory and injunctive relief to require BUSD to provide legally-mandated services to schoolchildren with suspected disabilities and disabilities due to reading disorders, so that they can gain the essential life skill of learning to read as early as possible along with their nondisabled peers and to participate fully in their education throughout their years in BUSD, as are their rights.  This action is necessary to bring an end to the immense personal and societal costs of BUSD's fundamentally flawed response to Plaintiffs' learning needs.

## JURISDICTION

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and §§ 1343(a)(3) and (4), as this is an action for injunctive and declaratory relief brought pursuant to IDEA, 20 U.S.C. §§ 1400, *et seq.*, and its implementing federal regulations, 34 C.F.R Part 300; Section 504, 29 U.S.C. § 794, and its implementing regulations, 34 C.F.R. Pt. 104; and Title II of the ADA, 42 U.S.C. §§ 12131 *et seq.*, and its implementing regulations, 28 C.F.R. Pt. 35.

18.     Plaintiffs also bring claims under California Education Code §§ 56000 *et seq.* and its implementing regulations, Cal. Code Regs. tit. 5 §§ 3000 *et seq.*  This Court has supplemental

jurisdiction over Plaintiffs' Section 56000 claims pursuant to 28 U.S.C.A. § 1367(a), as these claims are so related to Plaintiffs' claims under IDEA, Section 504, and ADA, that they form part of the same case or controversy.

19.     This Court has jurisdiction to issue a declaratory judgment pursuant to 28 U.S.C. § 2201.

## VENUE

20.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2).

21.     Defendants reside in the Northern District of California and a substantial part of the events or omissions giving rise to this action arose in Alameda County, which is located within the Northern District of California.

22.     Members of the Class reside in the Northern District of California.  The Plaintiffs reside in the Northern District of California.

## INTRADISTRICT ASSIGNMENT

23.     This action must be assigned to the San Francisco or Oakland Divisions of the Northern District of California pursuant to Civil Local Rule 3-2(d) because this action arises in Alameda County.

## PARTIES

### Plaintiffs

24.     Plaintiff Student A is a 7 year-old second grade student at a BUSD elementary school.  Student A resides with her guardian, Parent A, in Berkeley, Alameda County, California, and comes within the jurisdiction of Defendants.  Student A has been diagnosed with SLDs in the areas of reading (dyslexia) and math, disabilities that entitle her to services under IDEA, Section 504, ADA, and Section 56000.  BUSD recently determined that Student A was ineligible for special education and related aids and services within the meaning of IDEA, despite Student A's clear reading disorder and resulting anxiety and avoidant behaviors.  Student A's parents disagreed with this determination, and they continue to have to pay for private reading intervention services for Student A.  BUSD has failed to provide her a FAPE in the LRE.  Student

A brings this action by and through her guardian, Parent A.

25.     Plaintiff Student B is a 9 year-old fourth grade student at a BUSD elementary school.  Student B resides with his guardian, Parent B, in Berkeley, Alameda County, California, and comes within the jurisdiction of Defendants.  Student B has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and SLDs in the areas of reading (dyslexia), written expression, and math, disabilities that entitle him to services under IDEA, Section 504, ADA, and Section 56000.  BUSD has failed to provide him a FAPE in the LRE.  Student B brings this action by and through his guardian, Parent B.

26.     Plaintiff Student C is a 15 year-old ninth grade student at Berkeley High School ("BHS").  Student C resides with his guardian, Parent C, in Berkeley, Alameda County, California, and comes within the jurisdiction of Defendants.  Student C has SLDs in the areas of reading (dyslexia), written expression, and math, disabilities that entitle him to services under IDEA, Section 504, ADA, and Section 56000.  BUSD has failed to provide him a FAPE in the LRE.  Student C brings this action by and through his guardian, Parent C.

27.     Plaintiff Student D is a 17 year-old twelfth grade student at BHS.  Student D resides with her guardian, Parent D, in Berkeley, Alameda County, California, and comes within the jurisdiction of Defendants.  Student D has a learning disability in the area of reading (dyslexia), a disability that entitles her to receive services under IDEA, Section 504, ADA, and Section 56000.  BUSD has failed to provide her a FAPE in the LRE.  Student D brings this action by and through her guardian, Parent D.

28.     Plaintiffs Student A, Student B, Student C, and Student D have standing to bring this action to enforce IDEA pursuant to 20 U.S.C. § 1415(i)(2), which provides that, "[a]ny party aggrieved by the findings and decision made under subsection (f) or (k) who does not have the right to an appeal under subsection (g), and any party aggrieved by the findings and decision made under this subsection, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy."

29.     Each Plaintiff has standing to bring this action to enforce Section 504 pursuant to 29 U.S.C. § 794a(a)(2), which provides that, "[t]he remedies, procedures, and rights set forth in Title VI of the Civil Rights Act of 1964 . . . shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance . . . ."

30.     Each Plaintiff has standing to bring this action to enforce ADA pursuant to 42 U.S.C. § 12133, which provides that "[t]he remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title."

31.     Each Plaintiff has standing to bring this action to enforce California Education Code §§ 56000 *et seq.* pursuant to Cal. Educ. Code § 56500.1(a), which provides that "[a]ll procedural safeguards under the Individuals with Disabilities Education Act (20 U.S.C. Sec. 1400 and following) shall be established and maintained by each noneducational and educational agency that provides education, related services, or both, to children who are individuals with exceptional needs", including the right to bring a civil action under IDEA.

**Defendants**

32.     Defendant BUSD is a government agency responsible for providing school children with full and equal access to the public education programs and activities it offers in compliance with the requirements of federal and state laws and regulations.  On information and belief, BUSD is chartered and incorporated under California law and is a recipient of federal financial assistance.  BUSD's responsibilities include making and implementing educational decisions for the schools within its jurisdiction.

33.     Defendant Donald Evans ("Defendant Evans") is the Superintendent of BUSD. Defendant Evans is appointed by the Board of Education to implement policies created by the Board of Education and/or mandated by federal and state laws and regulations.  Defendant Evans is responsible for ensuring that children in BUSD are provided equal access to public education programs and activities offered in BUSD.  Defendant Evans is also responsible for ensuring that all eligible children with disabilities are provided a FAPE in the LRE, including special education and related aids and services in compliance with federal and state laws and regulations.

1    Defendant Evans is sued only in his official capacity.

2       34.    Defendant Board of Education of the BUSD ("Board of Education") works with

3    Defendant Evans, in his capacity as Superintendent, to fulfill its major responsibilities, which

4    include, among others:

5       • "Setting the direction for the district through a process that involves the

6          community, parents/guardians, students, and staff and is focused on student

7          learning and achievement";

8       • "Establishing academic expectations and adopting the curriculum and instructional

9          materials";

10      • "Monitoring and evaluating the effectiveness of [its] policies"; and

11      • "Monitoring student achievement and program effectiveness and requiring program

12         changes as necessary."[11]

13      35.    Defendants are Beatriz Leyva-Cutler, Ty Alper, Judy Appel, Josh Daniels, and

14   Karen Hemphill, who are Directors of the Board of Education (collectively, "Director

15   Defendants"), and they are sued only in their official capacities.

16      36.    Defendants Evans, the Board of Education, the Director Defendants, and BUSD

17   are collectively and interchangeably referred to as "Defendants" or "BUSD."

18                              **STATUTORY FRAMEWORK**

19      37.    IDEA, Section 504, ADA and Section 56000 require that California school

20   districts offer a "FAPE in the LRE" to children identified as disabled under those laws.  ADA

21   requires that no qualified individual with a disability shall, by reason of such disability, be

22   excluded from participation in or be denied the benefits of the services, programs, or activities of

23   a public entity, such as a school, or be subject to discrimination by such entity.  42 U.S.C. §

24   12132.  The requirements regarding the provisions of a FAPE, specifically described in Section

25   504 regulations, are incorporated in the general non-discrimination provisions of the applicable

26   ADA regulation.  28 C.F.R. § 35.103(a).

27   ///

28   _____
     [11] Board Bylaws 9000, Role of the Board (June 24, 2015).

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF          CASE NO. 3:17-cv-2510

**IDEA**

38.     IDEA is a federal grant program administered by the U.S. Department of Education ("DOE").  20 U.S.C. §§ 1400 *et seq.*  States, including California, that receive DOE funds must comply with the mandates contained in IDEA and its implementing regulations.  In turn, school districts must comply with IDEA and meet IDEA-standards established by the state education agency, which is CDE in California.  20 U.S.C. § 1401(9)(B).

39.     IDEA's primary mandate is the guarantee that "all children with disabilities have available to them a [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).

40.     To carry out this broad mandate, BUSD must have  in effect policies, procedures and programs to ensure that all children who are in need of special education and related aids and services are identified, located, evaluated and provided a specially-designed Individualized Education Program ("IEP").[12]  The specific mandates of IDEA require Defendants to (1) identify, locate and evaluate every child suspected of having a disability, residing in the district's jurisdiction ("Child Find Duty"); (2) provide procedural safeguards to children with disabilities and their parents ("Procedural Safeguards Duty"); (3) consider data that demonstrate that prior, or as part of the referral process, students were provided appropriate instruction by qualified personnel ("Appropriate Instruction by Qualified Personnel Duty"); (4) comprehensively evaluate students to determine whether they are eligible for special education and related aids and services ("Evaluation Duty"); (5) after determining eligibility, offer and develop an IEP with effective special education and related aids and services, including appropriately intensive research-based interventions ("Special Education Duty"); and (6) monitor the efficacy of the special education and related aids and services provided to students, hold annual IEP meetings and more as needed to review progress and make changes or revisions to IEPs where necessary to ensure FAPE in the LRE ("Monitoring Duty").  20 U.S.C. §§ 1400 *et seq.*; 34 C.F.R. Pt. 300.

---

[12] 20 U.S.C. §§ 1412(a)(1), (a)(3)-(7), (a)(16), 1413(a)(1), 1414(a)-(e); 34 C.F.R. §§ 300.111, .301, .304-.311; Cal. Educ. Code § 56337; Cal. Code Regs. tit. 5 §§ 3030(b)(10)(A)-(C) (2017).

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF          CASE No. 3:17-cv-2510

**Child Find Duty**

41.     One of the specific mandates of IDEA is that "children with disabilities residing in the State and children with disabilities attending private schools . . . regardless of the severity of their disabilities, and who are in need of special education and related aids and services are identified, located, and evaluated . . . ." 20 U.S.C. § 1412(a)(3)(A).  This is known as the "Child Find Duty."

42.     The Child Find Duty requires school districts to timely identify, locate, and evaluate all children with suspected disabilities.  *Id.* § 1412(a)(3); 34 C.F.R. §§ 300.101(c), .111.  School districts, thus, must fulfill their Child Find obligation; otherwise, a child who has a disability or suspected disability under IDEA will not be identified and accordingly, will not receive appropriate special education.

**Procedural Safeguards Duty**

43.     IDEA expressly includes certain procedural safeguards, requirements, and duties of school districts to ensure meaningful parental participation, notification, and consent through the special education process.  20 U.S.C. §§ 1400, 1412(a), 1414; Cal. Educ. Code §§ 56000 *et seq.*; *see also* 34 C.F.R. Pt. 300.

44.     As part of the "Procedural Safeguards Duty," school districts must give parents prior written notice within a reasonable time before they propose or refuse to initiate or change the identification, evaluation, or educational placement or the provision of FAPE in the LRE to the child.  34 C.F.R. § 300.503; Cal. Educ. Code § 56500.4.  Thus, school districts must obtain informed written parental consent in order to support an initial evaluation of a student and an initial provision of special education services.  Parental consent is further required to provide special education services and re-evaluations.  Parental consent means that the parent is "fully informed of all information relevant to the activity for which consent is sought, in his or her native language, or through another mode of communication," and that the parent "understands and agrees" in writing to the carrying out of the activity for which his or her consent is sought.  34 C.F.R. § 300.9.

///

45.    School districts must ensure that the parents of a child with a disability are members of the IEP team that makes determinations regarding eligibility (20 U.S.C. § 1414(b)(4)(a)) and any group that makes decisions on the educational placement of their child. *Id*. § 1414(e); Cal. Educ. Code § 56342.5. School districts must ensure that the parents are invited to each IEP team meeting and are afforded the opportunity to participate, which includes: (1) notifying parents of the meeting early enough to ensure that they will be able to attend; (2) provide information to parents; and (3) afford parents the opportunity to know the purpose of the meeting, who will participate, and to identify other representatives who should be invited.  20 U.S.C. §§ 1400, 1412(a), 1414, 1415; *see also* 34 C.F.R. §§ 300.309(b)(2) and (c), .311(a)(7)(ii) and (b), .321, 300.327, 300.501(c).

**Appropriate Instruction by Qualified Personnel Duty**

46.    IDEA regulations provide that:

> To ensure that underachievement in a child suspected of having a specific learning disability is not due to lack of appropriate instruction in reading or math, the group must consider, as part of the evaluation described in §§ 300.304 through 300.306 - (1) Data that demonstrate that prior to, or as a part of, the referral process, the child was provided appropriate instruction in regular education settings, delivered by qualified personnel; and (2) Data-based documentation of repeated assessments of achievement at reasonable intervals, reflecting formal assessment of student progress during instruction, which was provided to the child's parents.  34 C.F.R. § 300.309(b).

47.    With respect to SLDs, IDEA additionally mandates that school districts that offer and provide "response-to-intervention programs" ("RTI") must provide "scientific, research-based intervention." 20 U.S.C. § 1414(b)(6)(B); 34 C.F.R. § 300.309(a)(2)(i).  "RTI is a multi-tiered [instructional] approach to help struggling learners.  Students' progress is closely

///

///

///

1    monitored at each stage of intervention to determine the need for further research-based

2    instruction and/or intervention in general education, in special education, or both."[13]

3         48.    The rate of the student's progress in these interventions may be used as a part of

4    the identification, referral and evaluation process.  34 C.F.R. § 300.309(b)(1); Cal. Code Regs. tit.

5    5 § 3030(b)(10)(C)(4)(i) (2017).  If the student participated in RTI, IDEA eligibility

6    determinations must include additional documentation regarding instructional strategies used,

7    student-centered data collected, and specific notice to parents regarding these services, strategies

8    for increasing the student's rate of learning and their right to request an evaluation.  34 C.F.R. §

9    300.311(a)(7); *see also* 34 C.F.R. § 300.311(b) (specific documentation requirements by persons

10   involved in evaluations, including parents).

11        49.    Ineffective RTI services fail to collect valuable data to refer a student to special

12   education, leading the student to receive only a limited response and ultimately, delayed special

13   education evaluation and special education services.[14]

14                              **Evaluation Duty**

15        50.    Once a child is identified under Child Find, school districts must promptly seek

16   parental consent to evaluate him or her for special education, under mandated timeframes,

17   including when the child has not made adequate progress after an appropriate period of time

18   when provided with appropriate instruction.  20 U.S.C. §§ 1414(b)(6); 34 C.F.R. §§ 300.301,

19   300.309(c).  School districts must evaluate a child who is referred for an evaluation by a parent

20   unless they provide adequate written notice giving their reasons for refusal.  34 C.F.R. § 300.503;

21   Cal. Educ. Code § 56500.4.  IDEA requires school districts to conduct comprehensive "initial

22   evaluations" to "determine whether a child is a child with a disability" and "determine the

23   educational needs of such child."  20 U.S.C. §§ 1414(a)-(c); *see also* 34 C.F.R. § 300.301; Cal.

24   Educ. Code § 56320.  The results of this Evaluation Duty are used to determine the child's

25

26   [13] Deb Gorski, What is RTI? What is RTI? | RTI Action Network,
     http://www.rtinetwork.org/learn/ what (last visited Apr 30, 2017).

27   [14] *See also* Memorandum from Melody Musgrave, Dir., Office of Special Educ. Programs, United
     States Dep't of Educ., (Jan. 21, 2011), *available at*

28   http://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/osep11-07rtimemo.pdf.

1    eligibility for special education and related aids and services as well as to make decisions about

2    an appropriate educational program for the child.

3          51.    IDEA and its regulations establish a comprehensive process by which a child with

4    a disability must be evaluated.  The student's eligibility must be determined and an appropriate

5    program of special education and related aids and services must be developed and implemented.

6    With regard to the Evaluation Duty, a school district must use a variety of assessment strategies

7    to gather relevant information about the child and must assess the child in "all areas related to the

8    suspected disability."  34 C.F.R. §§ 300.304(b)(1), (c)(4).  Among the data to be considered, the

9    Evaluation Duty requires observations by teachers and related service providers; the school

10   district must produce this data at an IEP meeting.  *Id*. § 300.305.  The evaluation must contain

11   information from the child's parents and others who interact with the student on a regular basis.

12   20 U.S.C. §§ 1414 (b)(2)(A), (c)(1)(A).  Additionally, IDEA previously mandated the use of the

13   severe discrepancy standard in determining whether a student had a specific learning disability,

14   but this requirement was removed in 2004 when IDEA was amended.[15]

15         52.    Within 60 days from the date that the parents provide written consent to an

16   evaluation of their child, school districts must complete the Evaluation Duty and hold an IEP

17   meeting.  Cal. Educ. Code § 56344(a).  School districts must have an IEP in place at the

18   beginning of each school year for every eligible child with a disability in its jurisdiction.  20

19   U.S.C. § 1414(d)(2)(A); 34 C.F.R. § 300.323(a).

20         53.    The evaluation must encompass all suspected areas of the child's disability.  20

21   U.S.C. § 1414(a)(3)(B).  Evaluation results are then discussed with parents in an IEP team

22   meeting to determine if the child is eligible for special education.  *Id*. § 1414(a)(4).

23   ///

---

[15] 20 U.S.C. § 1414(b)(6)(A).  "New Sec. 300.307(a)(2) (proposed Sec. 300.307(a)(3)) requires States to permit the use of a process that examines whether the child responds to scientific, research-based interventions as part of the information reviewed to determine whether a child has an SLD.  The regulations reflect the Department's position on the identification of children with SLD and our support for models that focus on assessments that are related to instruction and promote intervention for identified children."  Assistance to States for the Education of Children with Disabilities and Preschool Grants for Children with Disabilities, 71 Fed. Reg. 46647 (Aug. 14, 2006), *available at* http://idea-b.ed.gov/uploads/finalregulations.html.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF          CASE NO. 3:17-cv-2510

**Special Education Duty**

54. Once determined as eligible for special education, a student receives an IEP, developed by his or her IEP team. 20 U.S.C. § 1414. Among other requirements, an IEP must include a "statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable,"[16] or other evidence-based programs, and a statement of modifications and accommodations needed. *Id*. §§ 1414(d)(1)(A)(i)(IV-VI); 34 C.F.R. § 300.320(a)(4). Further, to develop an IEP, the student's IEP team must also consider special factors, which include a child's communication needs and "whether the child needs assistive technology devices and services." 20 U.S.C. §§ 1414(d)(3)(B)(vi)-(v)*; see id*. § 1401(1). In sum, the IEP requirement ensures that the District finds an educational solution appropriate to the specific needs of the child, given his or her disability and circumstances.

55. IDEA requires school districts to ensure that all children with disabilities receive a FAPE in the LRE; thus, students with disabilities must be educated "to the maximum extent possible" with children without disabilities. 20 U.S.C § 1400(d); 34 C.F.R. § 300.114. A student with a disability can only be removed from the general education classroom if the student's education "cannot be achieved satisfactorily" with the use of supplementary aids and services. 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.114(a)(2).

56. Additionally, school districts have an obligation to provide instructional materials in accessible formats to students with disabilities. 20 U.S.C. § 1412(a)(23); 34 C.F.R. §§ 300.172, 300.210(b). Students with reading disorders typically do not make adequate progress in learning with grade level, print-based materials. For these materials to be accessible to these students, the materials may need to be modified or altered, which may or may not require the

---

[16] "Section 300.320(a)(4) incorporates the language in section 614(d)(1)(A)(i)(IV) of [IDEA], which requires that special education and related services and supplementary aids and services be based on peer-reviewed research to the extent practicable. The Act does not refer to 'evidenced-based practices' or 'emerging best practices,' which are generally terms of art that may or may not be based on peer-reviewed research. . . . The phrase 'to the extent practicable,' as used in this context, *generally means that services and supports should be based on peer-reviewed research to the extent that it is possible, given the availability of peer-reviewed research*. We do not believe further clarification is necessary." Assistance to States*, supra*, at 46665 (emphasis added).

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF          CASE NO. 3:17-cv-2510

1    materials to be converted in to a specialized format.  17 U.S.C. § 121(d)(4) ("specialized formats"

2    means "Braille, audio, or digital text which is exclusively for use by blind or other persons with

3    disabilities" and "includes large print formats")*; see* 34 C.F.R. § 300.172(e)(1)(iv); 20 U.S.C. §

4    1474(e)(3)(D).

5                                           **Monitoring Duty**

6           57.    IDEA mandates that a child with an IEP in place must have the IEP reviewed

7    "periodically, but not less frequently than annually, to determine whether the annual goals for the

8    child are being achieved."  20 U.S.C. § 1414 (d)(4)(A)(i).  Moreover, where there is a lack of

9    expected progress toward the annual goals and in the general education curriculum, the IEP in

10   place must be revised to reflect updated goals, strategies, and/or resources.  *Id*. § 1414

11   (d)(4)(A)(ii)(I).  School districts must regularly inform parents of their child's progress toward

12   the annual IEP goals and their child must be reevaluated at their request and every three years.

13   *Id*. §§ 1414(a)(2)(A)(ii), (B)(ii).

14                                          **SECTION 504**

15          58.    Section 504 is a federal law that protects individuals with disabilities in programs

16   and activities that receive federal financial assistance.  29 U.S.C. § 794; 34 C.F.R. §§ 104.1, .4.

17   Specifically, Section 504 states that "[n]o otherwise qualified individual with a disability in the

18   United States … shall, solely by reason of her or his disability, be excluded from the participation

19   in, be denied the benefits of, or be subjected to discrimination under any program or activity

20   receiving Federal financial assistance. . . "  29 U.S.C. § 794(a).  Thus, Section 504 applies to all

21   school districts that receive federal financial assistance.  *Id*. § 794(b)(2); 34 C.F.R. § 104.31 .

22          59.    According to Section 504's implementing regulations, school districts must

23   "designate at least one person to coordinate its efforts to comply with this part."  34 C.F.R. §

24   104.7(a).  School districts must provide "appropriate education" to a "qualified handicapped

25   person."  *Id*. § 104.33.  A student with a disability satisfies the definition of a "qualified

26   handicapped person" if the student "(i) has a physical or mental impairment which substantially

27   limits one or more major life activities [such as learning or reading], (ii) has a record of such an

28   impairment, or (iii) is regarded as having such an impairment."  34 C.F.R. § 104.3(j).

---

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF            CASE NO. 3:17-cv-2510

60.     School districts must provide the student who is a "qualified handicapped person" with an "appropriate education," which is defined as "regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met, and (ii) are based upon adherence to procedures that satisfy the requirements of [34 C.F.R. §§ 104.34, 104.35, and 104.36." *Id*. § 104.33(b)(1). School districts are required to provide these students with a "free appropriate public education" "regardless of the nature or severity of the person's handicap" and "with persons who are not handicapped to the maximum extent appropriate to the needs of the handicapped person … unless … the education of the person in the regular environment with the use of supplementary aids and services cannot be achieved satisfactorily." *Id*. §§ 104.33(a), .34(a).

61.     Before determining placement, school districts must evaluate the student who "needs or is believed to need special education or related services before taking any action" regarding the student's placement in regular education, special education, or any other significant change in placement. *Id*. § 104.35(a). Once a student has been evaluated, school districts must consider data about the student and make placement decisions using information from a variety of sources, create procedures to ensure that the information obtained is documented and carefully considered, ensure that the placement decision is made by a group of people, including those knowledgeable about the student, the evaluation data, and placement options, and ensure that the student is educated with nondisabled peers to the "maximum extent appropriate" for the student. *Id*. § 104.35(c).

62.     Additionally, Section 504 prohibits school districts from discrimination against students who meet the definition of a "qualified handicapped person." Specifically,

[a] recipient, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap: (i) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service; (ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid,

benefit, or service that is not equal to that afforded others; (iii) Provide a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others; (iv) Provide different or separate aid, benefits, or services to handicapped persons or to any class of handicapped persons unless such action is necessary to provide qualified handicapped persons with aid, benefits, or services that are as effective as those provided to others; . . . or (vii) Otherwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service.

*Id.* §§ 104.4(b)(1)(i)-(iv), (vii).

63.    The regulations implementing Section 504 further state:

A recipient may not, directly or through contractual or other arrangements, utilize criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons, or (iii) that perpetuate the discrimination of another recipient if both recipients are subject to common administrative control or are agencies of the same state.

*Id.* § 104.4(b)(4).

64.    For aids, benefits, or services to be "equally effective," students who are "qualified handicapped persons" must be given "equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs." *Id.* § 104.4(b)(2).

65.    While a student who is eligible for special education and related aids and services under IDEA receives an IEP, a student who is eligible only under Section 504 may receive a 504 Plan that like an IEP sets forth the special education and related aids and services, especially including accommodations and modifications, which the student is entitled to receive.  A 504

Plan has fewer procedural requirements and procedural safeguards than an IEP.[17]   Additionally, because Section 504 has a broader definition of disability than IDEA, many more students are eligible under Section 504 than under IDEA.  Students who are eligible for an IEP also receive the non-discriminatory protections afforded under Section 504.  However, students who are eligible only under Section 504 are ineligible for protections afforded under IDEA.

### TITLE II OF THE ADA

66.     ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130.

67.     Title II of the ADA applies to all of the activities of public entities, including school districts that provide public education.  The requirements regarding the provisions of a FAPE in the LRE, specifically described in Section 504 regulations, are incorporated in the general non-discrimination provisions of the applicable ADA regulation.  28 C.F.R. § 35.103(a).

68.     The implementing regulations to ADA define an individual with a disability as follows: "(a)(1) Disability means, with respect to an individual: (i) A physical or mental impairment that substantially limits one or more of the major life activities of such individual; (ii) A record of such an impairment; or (iii) Being regarded as having such an impairment . . . ." *Id*. § 35.108.

69.     The regulations implementing Title II of the ADA state that

[a] public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability . . . (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that

---

[17] *Frequently Asked Questions About Section 504 and the Education of Children with Disabilities*, U.S. Dep't of Educ., Office of Civil Rights (Oct. 16, 2015), https://www2.ed.gov/about/offices/list/ocr/504faq.html.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF          CASE NO. 3:17-cv-2510

afforded others; (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others; (iv) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others; . . . [or] (vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.  *Id*. § 35.130(b)(1)(i), (ii), (iii), (iv), (vii).

70.    Further, "[a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or (iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State."  *Id*. § 35.130(b)(3).

71.    Thus, the regulations implementing Title II of the ADA require that public entities avoid unnecessary policies, practices, criteria or methods of administration that have the effect or tendency of excluding or discriminating against individuals with disabilities.  *Id*. §§ 35.130(b)(3), (8).

72.    Further, "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  *Id*. § 35.130(d).  This means "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible."  28 C.F.R. pt. 35, App. B.

///

///

73.    Further, Title II regulations require public entities to "make reasonable modifications" to their programs and services "when the modifications are necessary to avoid discrimination."  28 C.F.R. § 35.130(b)(7)(i).

**CALIFORNIA STATE LAW**

74.    California state law implementing IDEA also requires educational instruction and services to a student "with exceptional needs" if "the degree of the [student's] impairment . . . requires special education . . . ."  Cal. Code Regs. tit. 5 § 3030(a) (2017); *see* Cal. Educ. Code §§ 56000 *et seq.*

75.    The term student "with exceptional needs" includes students with SLDs, which is defined as

> a disorder in one or more of the basic psychological processes involved in understanding
> or in using language, spoken or written, that may have manifested itself in the imperfect
> ability to listen, think, speak, read, write, spell, or do mathematical calculations, including
> conditions such as perceptual disabilities, brain injury, minimal brain dysfunction,
> ***dyslexia***, and developmental aphasia.  The basic psychological processes include
> attention, visual processing, auditory processing, phonological processing, sensory-motor
> skills, cognitive abilities including association, conceptualization and expression.  Cal.
> Code Regs. tit. 5 § 3030(b)(10) (2017) (emphasis added).

76.    To determine whether a student has a reading disorder, public school districts may consider whether a student has a severe discrepancy between intellectual ability and academic achievement.  *Id*. § 3030(b)(10)(B).  Using severe discrepancy, however, is not the only means by which school districts can identify students with reading disorders.  *Id*. § 3030(b)(10)(C).  Under state regulations, students may be determined to have a SLD whether or not they exhibit a severe discrepancy.  *Id*.

77.    Additionally, as in IDEA (34 C.F.R. § 300.309(a)(1)-(3)), several other factors can be considered together in order to determine whether a student has a reading disorder.  Cal. Code Regs. tit. 5 § 3030(b)(10)(C)(1)-(3).  Further,

///

[t]o ensure that underachievement in a pupil suspected of having a specific learning disability is not due to a lack of appropriate instruction in reading or math, the group making the decision must consider: (i) Data that demonstrate that prior to, or as a part of, the referral process, the pupil was provided appropriate instruction in regular education settings, delivered by qualified personnel; and (ii) Data-based documentation of repeated assessments of achievement at reasonable intervals, reflecting formal assessment of student progress during instruction, which was provided to the pupil's parents. *Id.* § 3030(b)(10)(C)(4); 34 C.F.R. § 300.309(b).

78.      Once a student is determined to have a reading disorder and needs special education, an IEP must be created for the student.  Cal. Code Regs. tit. 5 § 3040.  As provided under IDEA, California law provides that students with reading disorders should also be assessed to determine the need for AT to access instructional materials and the educational curriculum. Cal. Educ. Code § 56341.1(b)(5) (student's IEP team must consider whether student requires AT devices and services); *see id.* §§ 56341.1(c) (if student's IEP team determines that the student needs AT devices and/or services, then a statement regarding this determination must be included in the student's IEP), 56020.5; Cal. Code Regs. tit. 5 § 3051.19 (2017).

## FACTUAL ALLEGATIONS

### Dyslexia and Its Impact

79.      "Dyslexia is a specific learning disability that is neurobiological in origin.  It is characterized by difficulties with accurate and/or fluent word recognition and by poor spelling and decoding abilities.  These difficulties typically result from a deficit in the phonological component of language that is often unexpected in relation to other cognitive abilities and the provision of effective classroom instruction.  Secondary consequences may include problems in reading comprehension and reduced reading experience that can impede growth of vocabulary and background knowledge."[18]

///

---

[18] *Definition of Dyslexia*, Int'l Dyslexia Ass'n (2002), https://dyslexiaida.org/definition-of-dyslexia/.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF          CASE NO. 3:17-cv-2510

80.     Depending on the degree of dyslexia, students with dyslexia may have difficulty with phonological awareness (ability to recognize sound structure in words), including phonemic (sound) awareness and manipulation, single word reading, reading fluency, and spelling.[19]

81.     Without appropriate interventions, services, and supports, a student with dyslexia will likely struggle with reading comprehension and written language expression, causing detrimental impacts on his or her ability to read, write, and learn.[20]  Further, a student with dyslexia may feel discouraged about school, undergo a great deal of stress due to academic problems, and have major struggles with self-image and in relating to other people.[21]

82.     Moreover, early identification of dyslexia is critical to a student with dyslexia. "[A]ppropriate early intervention, provided in kindergarten through grade three, is very effective in closing the gap for struggling readers.  Early intervention and additional direct instruction should begin as early as kindergarten or first grade for struggling readers when the gap is small and students benefit from brain plasticity advantages for learning language-based information."[22]

83.     Researchers have recommended the following reading interventions for students with reading disorders for years:  reading instruction for students with dyslexia should be (1) delivered as early as possible and not after the student has failed; (2) focused on teaching the structure of spoken and written language, beginning with phonology (*i.e.*, the awareness of the speech sound system); (3) systematic, cumulative, explicit teaching of letters, letter-sound correspondences, and patterns of orthography; (4) direct, teacher-led lessons with modeling, supported practice, and independent practice; and (5) planned carry-over of skills into text reading that does not allow the student to guess at words from pictures or context.[23]  Most

---

[19] *Dyslexia Basics*, Int'l Dyslexia Ass'n (2012), https://dyslexiaida.org/dyslexia-basics/.

[20] *Id.*

[21] *Id.*

[22] *Dyslexia Assessment: What Is It and How Can It Help?*, Int'l Dyslexia Ass'n (2017), https://dyslexiaida.org/dyslexia-assessment-what-is-it-and-how-can-it-help/.

[23] *See Dyslexia Basics, supra; see also Foundational Skills to Support Reading for Understanding in Kindergarten Through 3rd Grade*, U.S. Dep't of Educ., Nat'l Ctr. for Educ. Evaluation & Reg'l Assistance (July 2016), https://ies.ed.gov/ncee/wwc/Docs/PracticeGuide/wwc_foundationalreading_070516.pdf.

1   teachers trained to teach students with reading disorders such as dyslexia recognize that they

2   engage students more successfully if they use tactile-kinesthetic techniques to support symbol

3   memory.  Hands-on manipulatives and actives, such as tracing and writing letters, have been

4   shown to work better in holding students' attention and supporting memory for mysterious

5   symbols called letters.[24]

6                              **Defendants' Unlawful Policies and Practices**

7           84.    On information and belief, Defendants' policies and practices violate federal and

8   state laws and implementing regulations cited above in all of the following ways:

9           85.    ***Failure to have in effect legally compliant policies, procedures, and programs***

10  ***required with respect to students with reading disorders.***  Defendants have failed to put into

11  effect policies, procedures and programs that ensure that all students with suspected reading

12  disorders are timely identified, located, evaluated, and that all students with eligible conditions

13  based on reading disorders are provided appropriate special education and related aids and

14  services, and monitored to ensure FAPE in the LRE.[25]  In fact, contrary to express provisions in

15  the applicable statutes—and common sense—numerous BUSD administrators have repeatedly

16  stated that the District does not even recognize dyslexia as a "processing disorder."  BUSD

17  continues to refuse to offer services necessary to ensure FAPE in the LRE to students with

18  reading disorders.

19          86.    ***Failure to satisfy Child Find obligations with respect to students with reading***

20  ***disorders.***  Defendants fail to affirmatively identify or locate children with suspected reading

21  disorders including students in private schools.  Further, BUSD actively discourages parents from

22  seeking evaluations.

23          87.    ***Failure to provide procedural safeguards to students with disabilities and their***

24  ***parents.***  Defendants fail to ensure that students with disabilities and their parents are provided

---

25  [24] *See* Beverly J. Wolf et al., Multisensory Teaching of Basic Language Skills (Judith Birsh ed.,
26  Brookes Publishing 3d ed. 2011); Judith Birsh, *What is Multisensory Structured Language?*, *in*
    Expert Perspectives on Interventions for Reading, 45-55 (Louisa Moats, Karen E. Dakin, and R.
27  Malatesha Joshi eds. 2012).

    [25] With respect to Section 504 in particular, BUSD has essentially ignored the essential mandate to
28  employ staff responsible to coordinate its efforts to comply with Section 504.

---

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF          CASE NO. 3:17-cv-2510

procedural safeguards.  For example, Defendants routinely fail to provide required written notice to parents when they refuse to evaluate or appropriately serve students with reading disorders or suspected reading disorders.  Further, Defendants fail to ensure that parents are afforded an opportunity to meaningfully participate in decisions regarding evaluations, eligibility, and the development of their child's IEP.

88.  ***Failure to use an appropriate RTI framework for early identification and intervention for students with suspected disabilities based on reading disorders.***  Rather than providing appropriate RTI,[26] including timely universal screening, intensive early and research-based intervention, and referrals of students who fail to respond for special education evaluations, Defendants employ a "wait to fail" approach – Defendants simply wait for students who they suspect to have a reading disorder to fall further and further behind academically, and often have resulting emotional or behavioral deficits, before identifying, locating, and evaluating these students for special education, if at all.  As part of Defendants' "wait to fail" approach, Defendants might randomly insist that parents first attend a Student Success Team ("SST") meeting (or multiple SST meetings) or participate in a noncompliant and ineffective RTI process before any special education evaluation is conducted.  Many months or years may pass by before a student with a suspected reading disorder is actually evaluated for special education by Defendants.  Many are never evaluated at all; specific IDEA service and evaluation requirements with respect to SLD and RTI are largely ignored.

89.  Defendants implement a kind of RTI that only provides general education reading interventions, such as "Leveled Literacy Intervention" ("LLI"), "Reading Recovery", and "Read 180"[27] to some struggling readers, regardless of whether their struggles are the result of a reading

---

[26] *Cf. Assisting Students Struggling with Reading: Response to Intervention (RtI) and Multi-Tier Intervention in the Primary Grades*, U.S. Dep't of Educ., Inst. of Educ. Scis. (Feb. 2009), https://ies.ed.gov/ncee/wwc/PracticeGuide/3, for state-endorsed RTI recommendations to identify struggling readers and implement evidence-based practices to serve them.

[27] BUSD purports to offer upper elementary and secondary students another reading intervention program, Read 180.  As with its other reading programs, Read 180 falls short for students with learning disabilities who have not learned to decode.  *WWC Intervention Report: Read 180*, What Works Clearinghouse (Nov. 2016), http://files.eric.ed.gov/fulltext/ED570964.pdf (no discernible effects on alphabetics for adolescent readers).

disorder.  While Defendants claim to provide targeted intervention and instruction at varying levels that respond to the needs of struggling readers, these interventions do not meet the needs of students with reading disorders, in part because they are not designed for students who cannot decode words.

90.     The two primary reading interventions provided by BUSD are LLI and Reading Recovery.  LLI is not specifically designed or supported by research to meet the needs of students with reading disorders.[28]  Similarly, several researchers have concluded that Reading Recovery should not be used with these students as it teaches them to "guess" words rather than reading words phonologically.[29]  Indeed, Reading Recovery has been proven to further harm students with reading disorders instead of help them.[30]

91.     Students with reading disorders need specialized and explicit instruction that teaches them how to decode and spell words and the alphabetic principle, among other things. Simply using general education programs that are based upon principles of "guessing" words and using "multiple cues" to infer a word's meaning, such as "Reading Recovery" or any form of guided reading, guarantees that students with reading disorders will be disserved and very possibly will never acquire the fundamental life skill of being able to read.[31]

---

[28] LLI has not been subject to peer-reviewed research.  The program description by the authors makes no mention of systematic phonics instruction based on diagnostic testing of student strengths and weaknesses in foundational reading skills.  *See Leveled Literacy Intervention (LLI)*, Fountas & Pinnell (2016), http://www.fountasandpinnell.com/lli/.  In short, it is practically the same as guided reading programs, which are ineffective for students with reading disorders.  *See also* Carolyn A. Denton, Jack M. Fletcher et al., *An Experimental Evaluation of Guided Reading and Explicit Interventions for Primary-Grade Students At-Risk for Reading Difficulties*, 7 J. Res. on Educ. Effectiveness 268-93 (2014).

[29] Alison W. Arrow and Claire McLachlan, *The Emergent Literacy Approach to Effective Teaching and Intervention*, PERSPS. ON LANGUAGE AND LITERACY 35 (2011); James W. Chapman and William E. Tunmer, *Reading Recovery: Does it Work?*, Persps. on Language and Literacy 21 (2011); *see* James W. Chapman and William E. Tunmer, *Is Reading Recovery an Effective Intervention for Students with Reading Difficulties? A Critique of the 13 Scale-Up Study?* 37 READING PSYCHOL. 1025-1042 (2016).

[30] Arrow, et al., *supra*, at p. 35; *see* Chapman, et al., *supra*, at p. 1025.

[31] Keith T. Greaney, *The Multiple Cues or "Searchlights" Word Reading Theory:  Implications for Reading Recovery*, Persps. on Language and Literacy 15 (2011).  *See also*, S. Baker, et al., *Evidence-based research on Reading Recovery* (2002), http://www.iferi.org/wp-content/uploads/2017/01/Researchers-letter-RR-2002.pdf (Reading Recovery is not successful with its targeted student population, the lowest performing students.).

92.     ***Failure to conduct timely or appropriate evaluations of students with suspected reading disorders***.  Defendants fail to evaluate students with suspected reading disorders.  Defendants frequently refuse to conduct evaluations despite repeated parental requests.  Even when evaluations occur, they are detrimentally delayed and improperly conducted.  For example, Defendants have improperly required parents to provide a medical diagnosis of students with suspected reading disorders prior to permitting parents to seek evaluations.  Upon being provided a medical diagnosis, Defendants have ignored these diagnoses, claiming they are "medical not educational".  Further, Defendants routinely fail to give required consideration to independent educational evaluations ("IEEs") provided by parents.

93.     Prior to issuing any IEPs under the IDEA framework, in its evaluation process, BUSD is implementing the "severe discrepancy" approach to identify whether BUSD students have a reading disorder.  This severe discrepancy standard requires a student to show a severe discrepancy between intellectual ability and academic achievement in the area of reading, writing or math in order to identify the student as having a SLD.  As stated before, IDEA previously mandated the severe discrepancy standard, but removed this requirement in 2004,[32] recognizing that the approach resulted in late identification and/or misidentification of students with learning disabilities, including reading disorders.  Accordingly, the 2004 amendments to IDEA no longer require school districts to take into account severe discrepancy between intellectual ability and academic achievement, but permit states to continue to use the standard, so long as the standard is properly applied.  State regulations specifically instruct school districts that students may otherwise qualify as having an SLD.  Cal. Code Regs. tit. 5 § 3030(b)(10)(C) (2017).

94.     Defendants are not applying the "severe discrepancy" standard with fidelity or with proper consideration of all academic achievement scores.  34 C.F.R. § 300.309(b)(2); Cal. Code Regs. tit. 5 § 3030(b)(10)(C)(4) (2017); *see also* 34 C.F.R. § 300.307; Cal. Code Regs. tit. 5 § 3030(b)(10)(B) (2017).  As a result, BUSD's application of the severe discrepancy requirement wrongly finds students ineligible under IDEA.

---

[32] 20 U.S.C. § 1414(b)(6)(A); Assistance to States, 71 Fed. Reg. at 46,647.

95.     Moreover, in November 2016, in spite of the governing law, at least one representative of Defendants represented that the District central office instructed BUSD staff to refuse to evaluate students with dyslexia or suspected dyslexia, until CDE issues non-mandatory dyslexia guidelines, which are required to be released in the fall of 2017.

96.     ***Failure to timely develop and revise appropriate "IEPs" or "504 Plans" for students with qualifying reading disorders***.  As set forth above, Defendants systematically fail to timely develop and revise as necessary appropriate IEPs and 504 Plans that include appropriate special education and related aids and services.  If and when students are finally found to have SLDs on the basis of reading disorders, Defendants have refused to offer and provide appropriately intensive research-based reading intervention services, which are essential for these students to learn and advance academically from grade to grade.  The reading interventions provided, if at all, to students with IEPs are the same as those provided to students in the district's RTI framework.  Moreover, Defendants fail to appropriately monitor student progress as required by law.

97.     Defendants also systematically fail to provide students with reading disorders with AT and instructional materials in accessible formats, which are also critical.  Even if Defendants provide students with reading disorders with some form of AT, the provision of AT is neither appropriate nor consistent.  Typically, students can use AT only at school, and must ask for it, which many students are too embarrassed to do.  Even worse, students are blamed for not receiving AT because "they don't like it or don't know how to use it", yet Defendants completely fail to provide appropriate training or support to students, teachers and parents on how to use AT.  Further, because Defendants often times prohibit students from taking AT home, students with reading disorders are unable to access instructional materials in accessible formats at home and are consequently unable to complete their homework.

98.     Altogether, because Defendants fail to provide appropriate special education and related aids and services, including appropriately intensive research-based reading intervention services, students fall further and further behind.  Consequently, BUSD students with reading disorders experience and are at high risk of extreme and ongoing frustration, greater anxiety,

1    humiliation, lowered self-esteem, and depression, which further interfere with their ability to

2    learn to read, and to enjoy equal opportunity to fully participate in and benefit from BUSD

3    classrooms and instructional programs.

4    **Plaintiffs Are Excused from Exhaustion of Administrative Remedies**

5         99.    Exhaustion of administrative remedies under the IDEA is excused when further

6    administrative actions would be futile; when an agency has adopted a policy or pursued a practice

7    of general applicability that is contrary to the law; and when relief available through additional

8    administrative efforts would be inadequate to address a plaintiff's claims.  All three of these

9    exceptions to exhaustion apply to Plaintiffs' claims herein.

10        100.   First, further administrative actions would be futile, as the same challenges alleged

11   in this complaint regarding BUSD's unlawful policies and practices have been rejected by the

12   reviewing authority, CDE.  Specifically, on May 29, 2015, the Disability Rights Education and

13   Defense Fund, Inc. ("DREDF") filed a "various" compliance resolution process ("CRP")

14   complaint against BUSD, North Region Special Education Local Plan Area, and CDE on behalf

15   of a group of students with SLDs and suspected SLDs in BUSD.  The CRP complaint challenged

16   BUSD's unlawful policies and practices regarding dyslexia, including its failure to consider

17   dyslexia diagnoses or provide services to students with dyslexia, in violation of obligations to

18   provide a FAPE in the LRE under IDEA.  A true and correct copy of DREDF's May 29, 2015,

19   CRP complaint is attached hereto as **Exhibit 1**.

20        101.   In its July 31, 2015 Investigation Report, CDE found (incorrectly) that BUSD was

21   in compliance regarding all SLD-related allegations.  A true and correct copy of the July 31,

22   2015, Investigation Report by CDE is attached hereto as **Exhibit 2**.  In clear violation of federal

23   and state law, the CDE's Investigation Report largely ignored the CRP complaint allegations,

24   failed to investigate them and parent declarations provided in support of the CRP complaint.

25   CDE simply accepted BUSD's denials of wrongdoing.

26        102.   DREDF filed a request for reconsideration on September 4, 2015, that challenged

27   the appropriateness of CDE's compliance determinations relating to BUSD's policies and

28   practices regarding dyslexia.  DREDF's request carefully explained where CDE's determinations

were based on misapplications of the law, investigation failures, relied on incorrect findings of fact, and reiterated the district-wide scope of the CRP complaint.  A true and correct copy of DREDF's Reconsideration Request, dated September 4, 2015, is attached hereto as **Exhibit 3**.

103.    Despite initially denying the request, on September 17, 2015, CDE notified DREDF that it would reconsider the CRP complaint.  On October 13, 2015, CDE sent a letter summarily rejecting DREDF's request for systemic corrective actions.  A true and correct copy of CDE's October 13, 2015, Reconsideration Report is attached hereto as **Exhibit 4**.  Once again, in clear violation of federal and state law, CDE's Reconsideration Report showed that CDE refused to conduct a meaningful investigation as required by IDEA.

104.    Plaintiffs are excused from further pursuing administrative remedies because it would be futile for them to file multiple CRP complaints with CDE based on the same issues that were raised in DREDF's CRP complaint filed with CDE in May 2015.  Repeatedly filing identical compliance complaints against BUSD on the same exact issues would serve no useful purpose.  As a result, it is highly improbable that Plaintiffs could obtain adequate relief by filing multiple CRP complaints with CDE.

105.    Second, because administrative remedies cannot provide adequate systemic relief such as that sought herein, administrative exhaustion is excused.  Federal case law and orders issued by state administrative law judges clearly support the excusal of plaintiffs who allege system-wide claims and seek system-wide remedies from undergoing multiple due process hearings before seeking judicial relief from the courts, as due process hearings in these situations would be futile.  Multiple due process complaints against a school district that challenge systemic or structural issues are "inefficient" and "ineffective" in achieving system-wide relief.  *Smith v. L.A. Unified Sch. Dist.*, 830 F.3d 843, 863 (9th Cir. 2016).  Such complaints based on the "same [systemic] policy" and "same evidence" would lead to "inconsistent rulings" and eventually require a federal district court to resolve any inconsistencies.  *L.M.P. ex rel. E.P. v. Sch. Bd.*, 516 F. Supp. 2d 1294, 1305 (S.D. Fla. 2007).

106.    Further, past orders from administrative law judges at the Office of Administrative Hearings ("OAH") clearly demonstrate that OAH will not adjudicate system-wide legal

1   deficiencies that are raised in due process complaints.  *In the Matter of Parent on Behalf of*

2   *Student v. Placentia-Yorba Linda Unified Sch. Dist.*, OAH Case No. 2014061022 (2014)

3   ("[S]ystemic claims on behalf of other students are not only outside of OAH's jurisdiction, but

4   run contrary to the express purpose of a due process proceeding to focus on the individual child

5   and his or her unique educational needs."); *In the Matter of Parent on Behalf of Student v.*

6   *Oakland Unified Sch. Dist.*, OAH Case No. 2014060963 (2014) (dismissing systemic claims that

7   were raised in the due process complaint because "OAH's jurisdiction is limited to due process

8   proceedings between a student, parent or guardian and the public agency involved in the

9   education of the student"); *In Matter of Guardian on Behalf of Student v. L.A. Unified Sch. Dist.*

10   *et al.*, OAH Case No. 2010110500 (2010) (dismissing alleged violations of Due Process and

11   Equal Protection Clauses of federal and state constitutions, Section 504, ADA, and the Unruh

12   Civil Rights Act because OAH lacks jurisdiction to address such claims in a due process hearing

13   under IDEA).

14        107.    Thus, because OAH lacks the jurisdiction to adjudicate systemic issues, or order

15   systemic relief on behalf of multiple students' claims, it would be perverse to require Plaintiffs to

16   file multiple individual due process complaints with OAH that challenge BUSD's unlawful

17   systemic policies and practices regarding students with reading disorders.

18        108.    Third, Plaintiffs are excused from administrative exhaustion because BUSD's

19   policies and practices regarding students with reading disorders are defective as a matter of law,

20   as described herein.

21                         **Plaintiff Student A**

22        109.    Student A is a 7 year-old second grade student at a BUSD elementary school.  An

23   independent evaluator recently diagnosed student A with SLDs in the areas of reading (dyslexia)

24   and math.  Student A has attended this BUSD elementary school since she started kindergarten in

25   the 2014-2015 academic year.  At all relevant times, Student A resided within the jurisdiction of

26   BUSD.

27        110.    Student A's academic struggles began shortly after she started elementary school.

28   At the end of Student A's kindergarten year, Student A's teacher observed and informed Student

A's parents that Student A was far below grade level in reading. When Student A started first grade, she was immediately placed in a Leveled Literacy Intervention ("LLI"), a general reading intervention, since her reading abilities were significantly below her peers. Student A's teachers reported that she made some progress in LLI, but she continued to show emotional distress and displayed reading avoidant behaviors at home. Student A, as a 7 year-old, began referring to herself as "stupid"; she regularly said, "I'm dumb" and "I hate reading".

111.    As a result, Student A's parents decided to privately fund tutoring for Student A starting in January 2016. In March 2016, BUSD removed Student A from LLI general education reading intervention. The school reported that she had made enough progress in reading to return to "Tier 1" intervention in her general education class. While Student A's teachers reported "steady progress with Tier 1 and 2 interventions", Student A's parents remained concerned about Student A's inability to decode words, low self-esteem and lack of academic progress, even with her private tutoring. An SST meeting was held at the end of the 2015-2016 School year, Student A's first grade year. Because Student A's parents suspected that their daughter may have a learning disability, they informed the SST team that they intended to refer Student A to BUSD for a special education evaluation, and did so in the spring of 2016.

112.    At the start of second grade, Student A's assessments for special education commenced. Student A was placed back in LLI in early October 2016. At this time it was reported by Student A's LLI instructor that Student A was reading at level "H".[33]

113.    An initial IEP meeting was held on October 27, 2016, to determine Student A's eligibility for special education and related aids and services. At this meeting, Student A's IEP team members reviewed her assessments. BUSD officials determined that Student A was ineligible for an IEP because, according to the BUSD school psychologist, Student A did not have a severe discrepancy or a processing deficit, so she did not have an SLD and accordingly did

---

[33] LLI uses a "text level gradient", which identifies a student's reading ability using an alphabetic letter. *F&P Text Level Gradient*, Fountas & Pinnell http://www.fountasandpinnell.com/intro/. Typically, students in kindergarten begin at level "A" and progress through the alphabet, moving from one reading level to the next (i.e., from level "A" to level "B", from level "B" to level "C", etc.). *Id.* Accordingly, a high school student should be reading at a level "Z+". *Id.* Second grade students are typically reading at a level "K" at the beginning of second grade. *Id.*

not need special education and related aids and services.  Student A's parents disagreed with this determination and noted next to their signatures in the initial IEP documents that they believed their daughter should have been found eligible for special education.  BUSD did not provide Student A's parents with prior written notice after denying Student A an IEP, nor was Student A considered for a 504 Plan for much needed accommodations at school including but not limited to audiobooks.

114.    BUSD only relied on the severe discrepancy standard in evaluating Student A and did not take into consideration other factors to determine whether or not Student A had an SLD, such as the fact that she had participated in general education reading interventions for the majority of her first and second grade school years and still could not decode words.

115.    BUSD officials improperly concluded that Student A was ineligible for special education and related aids and services because she received "average" composite scores on several of the standardized tests that were administered as part of BUSD's IEP assessment process.  However, it was also noted that scores were too discrepant to calculate Student A's processing speed and working memory, so it is unclear the procedure by which BUSD used to determine that Student A did not have a processing deficit.

116.    BUSD inappropriately and incorrectly interpreted Student A's test scores.  Further, BUSD disregarded Student A's inability to decode nonsense words.  Student A was also behind in many academic areas.  BUSD's cursory review of only Student A's "composite scores" on her standardized tests constitute an improper evaluation of her need for special education and related aids and services.

117.    Because BUSD failed to find Student A eligible for an IEP, Student A is currently not receiving any special education and related aids and services from BUSD. Even worse, two weeks after the October 2016 IEP meeting BUSD pulled her out of the LLI reading intervention. Though she had received minimal and inconsistent LLI, she was at least getting one on one support and attention, even if the reading intervention was inappropriate.  It was reported by the principal that she was removed because she was reading at a level "J", two levels up from where she was just a couple weeks prior.  The Principal reported that this was further proof that Student

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF          CASE NO. 3:17-cv-2510

A did not need specialized academic instruction.  Student A's parents have been forced to continue to privately fund educational therapy and provide interventions themselves to try to ensure that Student A doesn't suffer in general education.

**Plaintiff Student B**

118.    Student B is a 9 year-old fourth grade student at a BUSD elementary school. Student B has been diagnosed by independent evaluators with ADHD and SLDs in the areas of reading (dyslexia), written expression, and math.  Student B is identified by BUSD as an individual with a disability within the meaning of IDEA, Section 504 and ADA and as an individual with exceptional needs within the meaning of California Education Code Section 56026.  He is entitled to special education and related aids and services from BUSD as a resident of Alameda County in the city of Berkeley, California.  At all relevant times, Student B resided within the jurisdiction of BUSD.

119.    Student B began kindergarten at a BUSD elementary school in the 2012-2013 school year.  He struggled greatly with academics within weeks of starting school and displayed high levels of frustration and behavioral problems in class.  Despite being on notice of Student B's obvious learning and behavioral challenges, BUSD did not timely carry out its "Child Find" mandate to identify Student B for the purposes of evaluating him in all areas of suspected disability, nor did BUSD provide RTI services to him.  Student B's guardian, Parent B., repeatedly requested help from BUSD.

120.    Instead of evaluating Student B for special education and related aids and services, BUSD employees advised Parent B to take Student B to a doctor to get a medical assessment for medication.  Student B's teacher wrote a letter to Student B's medical doctor describing Student B's behavioral struggles as well as academic and fine motor deficits.  She stated that Student B avoided reading and writing, which was likely a contributing factor to his behaviors.  Student B's kindergarten teacher did not refer him for evaluation despite the fact that Student B could not function in the classroom.  Parent B had to remove him from school, attempted to homeschool him and then placed him in a public charter school.  This placement was also unsuccessful. Student B was re-enrolled in BUSD late in his first grade year, on October 7, 2013.  Two days

1    later Parent B referred Student B for a special education evaluation.

2        121.    Over a year after he first demonstrated struggles with academics, on November 14,

3    2013, BUSD found Student B, then age six, eligible for special education under the disability

4    categories of SLD based on a severe discrepancy between his intellectual ability and his

5    achievement in reading, and OHI, based on his ADHD diagnosis.  Student B's initial IEP

6    included inadequate goals in reading, listening comprehension, communication development,

7    behavior and attention.  Even worse he was provided with no research-based reading

8    interventions.  Because he was set up to fail, he could not reach his inadequate IEP goals,

9    especially his academic goals, much less make appropriate progress.

10       122.    Throughout his 2013-2014 first grade school year, Student B was deprived entirely

11   of any meaningful special education services.  BUSD limited Student B's services to supervision

12   by a one-to-one instructional aide ("IA"), who was not trained as a special education teacher or in

13   any behavior intervention techniques, which Student B needed due to behaviors associated with

14   his ADHD exacerbated by academic frustration.  Because of BUSD's failure to provide

15   appropriate services and supports, Student B displayed significant outbursts due to academic

16   frustration and humiliation.

17       123.    On June 5, 2014, Parent B requested an IEP meeting to discuss Student B's

18   continued lack of progress in reading and overall frustration at school.  Parent B brought Student

19   B's privately funded tutor to the IEP meeting, and she opined that reading was the single source

20   of Student B's high levels of frustration, which triggered his behaviors associated with ADHD.

21   However, BUSD refused to offer or provide any appropriate specialized academic instruction for

22   Student B's reading disorder.  As a last resort, Parent B requested that BUSD fund one-half of the

23   cost of the tutor for Student B to receive additional reading instruction outside of the school

24   environment since BUSD refused to do it in the classroom.  BUSD denied the request stating that

25   it had "provide[d] appropriate levels of direct instruction, intervention, and specialized services

26   and supports" to address Student B's significant reading deficits.  However, BUSD had not

27   provided any specialized services or academic instruction, with the exception of an untrained,

28   unqualified one-to-one IA to supervise Student B, as evidenced by Student B's IEP.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF          CASE NO. 3:17-cv-2510

1    124.    At the beginning of his 2014-2015 second grade school year, Student B was

2 suspended for aggressive behaviors.  A meeting to determine whether his behavior was a result of

3 his disabilities, known as a "Manifestation Determination Review", was held for Student B on

4 October 1, 2014.  Student B's IEP team noted that Student B had a very low frustration tolerance

5 and that he could not perform in the classroom with a larger group.  Instead of providing Student

6 B with additional or appropriate academic and behavioral support, BUSD informed Parent B,

7 over her objection that Student B could not return to public school.  BUSD offered to provide five

8 hours a week of home instruction until an "alternative placement" could be located.  While

9 BUSD unilaterally changed Student B's placement over Parent B's objection, it failed to provide

10 any "prior written notice" explaining its position as required by law, and failed to state any plans

11 for his return to school, or an alternative placement.

12    125.    Student B was out of school nearly one-half of his second grade school year, from

13 October 1, 2014 until January 9, 2015, due to the BUSD's failure to locate any school placement.

14 During the months at home, after being told to leave his public school, Parent B requested prior

15 written notice multiple times in response to her ongoing requests for placement and services, but

16 BUSD did not respond.  On January 9, 2015, BUSD finally offered a placement at a secluded day

17 school program called Catalyst Academy ("Catalyst"), a non-public school for children with

18 severe behavioral and emotional disabilities.  While Catalyst focused heavily on behavioral

19 modification, it admittedly was not academically focused and had no teachers trained in

20 interventions appropriate for children with reading disorders, like Student B.

21    126.    Throughout the rest of his 2014-2015 second grade school year, BUSD continued

22 to deprive Student B of any direct, appropriate academic interventions or services.  BUSD

23 completely failed to monitor Student B's placement and progress in any way.  His behaviors

24 increased dramatically while at Catalyst, and he fell further and further behind in academics,

25 especially reading.  On May 20, 2015, an IEP meeting was held for Student B.  At this meeting,

26 Catalyst staff reported they could not serve Student B because he was in a seclusion room by

27 himself 75% of his time at school due to serious behavioral incidents that were almost always

28 triggered by academic frustration.  BUSD ignored Catalyst staff's and Parent B's requests for

additional behavioral and academic support for Student B.  Parent B requested prior written notice regarding the request for additional services for Student B, but BUSD failed to provide required written notice of the basis for its refusals.

127.    Student B was placed on medication for his ADHD during the summer of 2016, and as a result, his behaviors decreased dramatically.  However, with fewer behavior incidents and more time in the classroom, his academic deficits became more pronounced.  While in third grade, on March 18, 2016, another IEP meeting was held for Student B; at this meeting, the IEP team reviewed the results of two IEEs of Student B.  Testing results revealed that Student B had made absolutely no academic progress over the course of an entire academic year.  Student B was at the end of his third grade year, but still reading at or below first grade levels at best.  Student B's teacher at Catalyst agreed with the results of the IEEs that he needed intensive academic remediation that could not be provided at Catalyst.

128.    The independent evaluators diagnosed Student B with SLDs in the areas of reading, writing and math, and recommended that Student B receive intensive and targeted one-on-one academic remediation; specifically, a structured, sequential, direct instruction approach to address Student B's needs in reading, writing and math for at least five hours a week.  But, because BUSD has a general policy to refuse and/or deny such research-based interventions for children with specific learning disabilities, and admittedly has no staff properly trained in any such methods, these recommendations were ignored.

129.    Subsequently, at Parent B's and Catalysts' insistence, Student B was moved back to a public school placement, where he could focus on academic remediation.  On April 14, 2016, he began attending BUSD's Cragmont Elementary School in a Counseling Enriched Special Day Class.  Unfortunately again, BUSD offered no specific or appropriate individualized academic instruction to address his reading disorders.

130.    Once back in public school, despite multiple parental requests, BUSD continued in its utter failure to provide any meaningful academic remediation and in its failure to provide prior written notice of its refusals.  BUSD never responded to the recommendations of the independent evaluators and never acknowledged or accommodated Student B's severe academic needs in his

1   new classroom.  His special day class teacher had no specific knowledge or training in teaching a

2   child with dyslexia how to read.

3         131.   On July 7, 2016, Parent B filed a due process complaint on behalf of Student B,

4   resulting in a confidential settlement agreement.

5         132.   Even after the filing of the due process complaint, BUSD continued in its

6   complete failure to provide any appropriate academic interventions for Student B.  He has

7   received no appropriate specialized academic instruction at all for the 2016-2017 fourth grade

8   school year, in part due to BUSD's failure to hire a special education teacher for his classroom.

9   Even after a special education teacher was hired, BUSD has failed to address Student B's

10  learning disabilities by continuing to provide inappropriate and ineffective reading interventions,

11  such as LLI.  Student B is still reading and functioning academically years behind his peers.

12  Because of the documented long history of BUSD's failure to provide appropriate academic

13  interventions, Student B currently reads between a first and second grade level, even though he is

14  nearing the end of his fourth grade school year.

15                                    **Plaintiff Student C**

16        133.   Student C is a 15 year-old ninth grade student at BHS.  Independent evaluators

17  have diagnosed Student C with SLDs in the areas of reading (dyslexia), written expression, and

18  math.  Student C is identified by BUSD as an individual with a disability under IDEA, Section

19  504 and ADA and as an individual with exceptional needs within the meaning of California

20  Education Code Section 56026.  He is entitled to special education and related aids and services

21  from BUSD as a resident of Alameda in the city of Berkeley, California.  At all relevant times,

22  Student C resided within BUSD and was only recently deemed to be a child with a disability as

23  defined by the IDEA.  Student C is a lifelong resident of Berkeley, California but attended private

24  schools for most of his educational career due to his significant academic needs, having been

25  privately diagnosed with severe dyslexia as a young child.

26        134.   BUSD did not identify or locate Student C under its "Child Find" duty when he

27  was in elementary and middle school at a private school.  In preparation for his transition from

28  private school to ninth grade at BHS, Parent C referred Student C to BUSD for a special

39

education evaluation in spring 2016.  In her written referral, Parent C provided BUSD with an independent evaluation from 2016 that confirmed Student C's previously diagnosed SLDs in the areas of reading, written expression and math.  Parent C identified Student C's severe dyslexia, which includes impairments in phonological processing as her primary concern.  Student C is very intelligent, but due to his severe dyslexia, he reads several years below his grade level and lacks basic word decoding skills.  Consequently, Student C cannot access the academic curriculum without specialized instruction and AT.

135.    In May 2016, BUSD completed an initial evaluation of Student C, and on May 18, 2016, an initial IEP meeting was held to discuss the results of BUSD's initial evaluation.  At this meeting, BUSD evaluators confirmed that Student C had significant impairments in all academic areas, but especially in reading decoding and fluency, and as a result, was reading several years below his grade level.  Accordingly, BUSD determined that Student C had an SLD and that he was, therefore, eligible for special education and related aids and services.

136.    Although it was well-documented that Student C would enter BHS with an inability to read at the ninth grade level, BUSD only developed three goals for Student C in his IEP – one each in "self-advocacy," "spelling," and "AT."  None of these goals addressed his significant academic needs, including his inability to read.  To reach these inadequate and inappropriate goals, BUSD only offered Student C a 55-minute support class once a day.  The support class – "Consultative Learning Centers" (also known as "CLC") – is a study hall type class where BHS students with disabilities go to learn organizational and study skills from a special education teacher.  On information and belief, students in the CLC do not receive any individualized reading, writing or math instruction.  Student C was not offered any kind of AT or AT services even though he had an AT goal, and BUSD was aware that Student C could only access textbooks in audio format.  BUSD failed to even evaluate Student C's AT needs or to include an AT specialist in the initial IEP process.  Thus, with inadequate and inappropriate goals, aids and services, BUSD failed to provide Student C with any meaningful special education and related aids and services.

///

137.    After Student C had attended BHS for approximately one month, Parent C requested another IEP meeting for her son in another attempt to secure essential services.  On September 27, 2016, Student C's IEP team met again. Student C did not feel the CLC class was useful to him in any way.  Parent C requested AT services and an AT evaluation.  While BUSD agreed to conduct further AT evaluations, which should have been done as part of his initial IEP evaluation, BUSD abruptly denied Student C any further special education and related aids and services, without prior written notice.  In response to Student C's reporting that CLC was not useful, BUSD offered Student C "15 minute meetings once a week with case manager" to "work on IEP goals, organization, technological needs, and for a general consult around grades and progress."  It is unclear how BUSD considered this to be a special education service at all.  This offer of "individualized instruction services" is entirely inappropriate for a high-school age student who cannot read independently.

138.    On December 14, 2016, the IEP team met again to review the AT evaluation, which had been completed pursuant to Parent C's request.  Based on the AT evaluation results, BUSD offered Student C five 60-minute sessions per year with an "AT specialist."  To date, it remains unclear what, if any, devices or aides Student C will be provided with or taught to use, or how BUSD considers this an adequate offer of AT services.

139.    While Parent C privately paid for support and services so that Student C could pass from grade to grade, BUSD, to date, has completely failed to provide Student C with any meaningful or appropriate special education and related aids and services.  Consequently, Student C is at-risk of graduating high school functionally illiterate, at best, and is very likely to have low self-esteem because of his inability to read.

**Plaintiff Student D**

140.    Student D is a 17 year-old twelfth grade student at BHS.  An independent evaluator has diagnosed Student D with a learning disability in the area of reading. Student D is identified by BUSD as an individual with a disability within the meaning of Section 504 and ADA.  She is entitled to special education and related aids and services from BUSD as a resident

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF          CASE NO. 3:17-cv-2510

of Alameda County in the city of Berkeley, California.  At all relevant times, Student D resided within the jurisdiction of BUSD.

141.    Student D attended a private school from kindergarten through eighth grade.  In third grade, Student D's private school evaluated Student D and found that Student D had difficulty reading.  To provide Student D with support, Parent D privately paid for educational therapy; Student D attended twice weekly educational therapy sessions during the academic year and three times a week during the summer after third, fourth, and fifth grades.  She continued to receive twice weekly educational therapy sessions throughout middle school.  Student D's private school also provided her with accommodations, including the permission to listen to audiobooks, a warning before the teacher called on Student D in class, the use of a calculator and a note card for rote memory items, such as formulas in math, a spelling accommodation for in-class writing assignments, and extra time on examinations, among others.  These accommodations coupled with educational therapies helped Student D to excel as a student.

142.    At no time throughout her elementary and middle school years did BUSD identify or locate Student D to carry out its "Child Find" duty.  Yet, during these years, Student D had been diagnosed privately with a reading disorder.  In 2010, Student D, while Student D was attending private school, Student D underwent an independent neuropsychological evaluation, which concluded that Student D had a superior I.Q., and dyslexia.

143.    Parent D referred her for a 504 evaluation in spring 2012, in preparation for her transition to BHS for the 2013-2014 ninth grade school year, but it was not until 2015 that Defendants found Student D eligible for a 504 Plan.  BUSD never referred Student D for an evaluation to determine whether or not she would qualify for special education and related aids and services.

144.    Because of Student D's disability-related academic needs, Parent D sent an email to the special education program specialist at BUSD in April 2012 to understand how BUSD provided accommodations to students with learning disabilities at BHS.  The program specialist agreed to meet with Parent D and to discuss the types of accommodations students with learning disabilities could receive at BHS.  Before this meeting, Parent D sent her Student D's records,

including Student D's 2010 neuropsychological evaluation, Student D's report cards, a private

school screening, and a request for extended time made by Student D's educational therapist,

among other records.

145.    On June 22, 2012, Parent D and the program specialist met, and at this meeting the

program specialist told Parent D that (1) Student D did not need accommodations at BHS because

she had a superior I.Q. and received As and Bs in her classes, (2) it did not matter that Student D

used accommodations to obtain As and Bs in her classes, (3) Student D would not qualify for

special education and related aids and services because Student D had to have a discrepancy

between I.Q. and academic achievement, have a processing disorder, *and* perform two grades

below her current grade level (while Student D had a discrepancy between her I.Q. and academic

achievement and a processing disorder, Student D did not perform at least two grades below her

grade level), and (4) Student D would not qualify for a 504 Plan.  Without any additional

evaluations conducted and without any other team members present, the program specialist

unilaterally concluded that Student D would not qualify for an IEP or a 504 Plan.  Thus, even

though Student D had a well-documented disability, BUSD did not even offer to evaluate Student

D to determine whether she was eligible for an IEP and/or 504 Plan.  Moreover, Parent D never

received any prior written notice from BUSD that it was refusing to evaluate Student D or that

Student D was ineligible for an IEP.

146.    Additionally, the BUSD program supervisor told Parent D that Student D's

academic needs would be determined by her teachers and high school counselor only *after* she

started high school – not before.

147.    In May 2013, prior to Student D starting ninth grade, Parent D sent several

documents to the Director of Student Services for BUSD.  The Director called Parent D and

informed her that Student D could not receive accommodations until after the beginning of the

school year and that her teachers and her high school counselor would determine her needs for

accommodations.  As a result, when Student D started ninth grade at BHS in the fall of 2013,

BUSD did not provide her with any accommodations.  A few weeks into academic year, Parent

D, Student D, Parent D's husband, and Student D's educational therapist, met Student D's high

school counselor, to discuss a 504 Plan for Student D.  None of Student D's teachers attended this meeting.  The counselor stated that the culture of the school required parents and their children to "prove" that the student needed accommodations.

148.   The counselor concluded that Student D was ineligible for accommodations as long as she maintained good grades.  Consequently, BUSD would not, and did not, provide Student D with any accommodations throughout ninth grade.  As a result, Parent D was forced to continue to supplement her daughter's education with educational therapy sessions for one hour, twice a week and an online subscription to Audible, which provided printed books in an audio format.  With these supports, Student D performed well and was an "A" student.

149.   At the beginning of her 2014-2015 tenth grade school year, Student D still did not receive any accommodations from BUSD.  She struggled increasingly with her assignments. Student D required extra time on examinations, but because she did not have a 504 Plan, Student D was forced to ask teachers individually if she could have extra time on her examinations. Student D was anxious to ask her teachers for extra time because she was worried that her teachers would not allow it. Parent D continued to provide Student D with support outside of school; Student D attended twice weekly educational therapy sessions and listened to audiobooks. Parent D also read to her aloud if Student D was unable to find particular subject matter in an audio format, which was very time consuming.  However, with these supports, Student D continued to receive As and Bs in her classes.

150.   While in tenth grade, Student D registered to take the PSAT, a standardized test. According to the College Board, Student D was not entitled to accommodations on the PSAT because she did not have a 504 Plan from BUSD. The counselor at BHS suggested that Student D take the PSAT without accommodations, and if she did not do well, it could serve as evidence to BUSD administration of Student D's need for a 504 Plan.  As a result of this advice, Student D took the PSAT without any accommodations.  She was unable to complete the examination, and her PSAT score was inconsistent with being an "A" student.

///

///

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF          CASE NO. 3:17-cv-2510

151.    In early 2015, in the middle of Student D's tenth grade year, the counselor and Parent D met to discuss Student D's academic needs again, including her need for accommodations.  No evaluations were offered by BUSD or conducted of Student D prior to this meeting, and no one else attended the meeting.  Parent D presented a journal that documented the times Student D required accommodations from her teachers, an additional letter of support for accommodations from her educational therapist, Student D's PSAT score, and letters from her ninth and tenth grade English teachers who both stated that Student D used audiobooks at home. The counselor unilaterally approved a 504 Plan for Student D.[34]  Student D's 504 Plan included the following accommodations: use of notecards with formulas, extra time to take tests, spelling accommodations, and use of a calculator.

152.    Subsequently, the counselor agreed to apply on behalf of Student D for accommodations (*i.e.*, extended time) with the College Board for the SAT, another standardized test.  However, the College Board rejected the counselor's application because "the documentation submitted does not support a need for extended time".  Parent D asked the counselor to re-apply with additional evidence of Student D's need for extended time, but the counselor said she could only "apply once" for Student D because it was too time consuming to submit multiple applications for the same student. Therefore, Parent D took the initiative to reach out to the College Board herself.  On July 28, 2015, Parent D spoke with an evaluator at the College Board, and the evaluator stated that Student D's lack of accommodations (lack of 504 Plan), during her ninth grade year played a crucial role in the College Board's rejection of the counselor's application for accommodations for Student D on the SAT, indicating that they were not necessary or called for.  Because Student D was again denied accommodations, Parent D privately paid for another neuropsychological evaluation of Student D in eleventh grade, in order to document Student D's academic needs and to prove to the College Board that Student D needed accommodations. Student D eventually obtained accommodations for the SAT.

///

---

[34]  Although this meeting occurred in early 2015, Student C's counselor suggested that they "back date" the 504 Plan to October 1, 2014, which they did.  The reason for the counselor's suggestion is unclear.

153.    While Student D continued to have a 504 Plan in the 2015-2016 eleventh grade school year, and now in twelfth grade, it is the exact same 504 Plan that was created in tenth grade.  Her 504 Plan has not been re-evaluated and her accommodations remain unchanged, despite her need for more.  Parent D continued to privately fund one hour, weekly educational therapy sessions for Student D in eleventh grade, and now in twelfth grade as well as a subscription to Audible, so that Student D has access to audiobooks.

154.    Despite Student D's need for audiobooks, BUSD has done little to nothing to address her academic needs in this area.  BUSD only occasionally provided Student D with Learning Ally, a website that provides students with access to audiobooks, but access to this website was not continuous and was limited to school use only.  Parent D has had to provide her with access to audiobooks so that she could participate equally with her classmates and graduate on time.

## CLASS ACTION DEFINITION ALLEGATIONS

155.    Pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, Plaintiffs bring this action for injunctive and declaratory relief on their own behalf and on behalf of all similarly situated students.  The Plaintiffs seek to represent the following Classes in this matter, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), as follows:

156.    **CLASS 1**:  All current and future BUSD Students who have or may have disabilities because of reading disorders such as dyslexia within the meaning of IDEA/related state laws and/or Section 504/ADA and who are or may be subject to BUSD's policies and practices concerning identification of students for the purposes of offering special education and related aids and services.

157.    **CLASS 2**:  All current and future BUSD Students who have or may have disabilities because of reading disorders such as dyslexia within the meaning of IDEA/related state laws and/or Section 504/ADA and who are or may be subject to BUSD's policies, procedures and practices concerning evaluations for the purposes of determining eligibility for special education and related aids and services.

///

158.   **CLASS 3**:  All current and future BUSD Students who have or may have disabilities because of reading disorders such as dyslexia within the meaning of IDEA/related state laws and/or Section 504/ADA and who are or may be subject to BUSD's policies, procedures and practices concerning provision of special education and related aids and services, including appropriately intensive research-based reading interventions, and accommodations and modifications as necessary to ensure a non-discriminatory FAPE.

159.   **CLASS 4**:  All current and future BUSD Students who have or may have reading disorders such as dyslexia within the meaning IDEA/related state laws and/or Section 504/ADA who are or may be subject to BUSD's policies, procedures and practices concerning monitoring student progress to determine effectiveness of services provided and need for further evaluation and/or revisions to their IEPs or 504 Plans.

160.   This action is an appropriate class action under Rule 23(b)(2), as BUSD has acted or refused to act on grounds that apply generally to each Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting each Class as a whole.

161.   **Numerosity**.  The persons in these Classes are so numerous that joinder of all such persons is impracticable.  Reading disorders affect a significant portion of the student population, the prevalence of which has been estimated between 5% and 17%.[35]  At present, BUSD includes approximately 10,000 students in grades K through 12.  Accordingly, Defendants' deficient policies and practices impact many hundreds of current and future students.

162.   **Commonality**.  There are questions of law and fact common to each Class identified above, namely whether BUSD's policies, procedures and practices related to identification, evaluation, eligibility determination, provision of special education and related aids and services, and monitoring of student progress to determine effectiveness of services provided and need for further evaluation and/or revisions to their IEPs or 504 Plans, violate IDEA and related state laws and/or Section 504/ADA.

///

---

[35] Fletcher, *supra*.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF          CASE NO. 3:17-cv-2510

163.   **Typicality**.  The claims of the named Plaintiffs are typical of the claims of the Classes, identified above, in that each of the named Plaintiffs is an individual with a reading disorder, such as dyslexia, that qualifies him or her as eligible for special education and related aids and services under IDEA and related state laws and/or Section 504/ADA, but named Plaintiffs: (1) were not timely identified pursuant to Defendants' Child Find Duty; (2) have not received a timely and appropriate evaluation and eligibility determination; (3) have not received timely and appropriate provision of special education and related aids and services, including an adequate IEP or 504 Plan; and (4) have not received appropriate monitoring of their progress or review of special education and related aids and services documented in their IEP or 504 Plan.

164.   **Adequate Representation**.  The named Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs do not have any interests antagonistic to the members of any Class.  The relief sought by Plaintiffs will inure benefit to the members of each Class.  Additionally, Plaintiffs are represented by counsel who are experienced, skilled, and knowledgeable about civil rights litigation, disability rights, and class action litigation.

### LEGAL CLAIMS

### First Claim for Relief

### Violations of the IDEA, 20 U.S.C. §§ 1400 *et seq.*, 34 C.F.R. Pt. 300

### (On Behalf of All Plaintiffs, Class Members)

165.   Plaintiffs incorporate the preceding paragraphs of this Complaint as if set forth in full herein.

166.   IDEA mandates that students with disabilities, between ages 3 and 21, have access to a FAPE in the LRE.  20 U.S.C. § 1412(a)(1)(A).  Students with suspected disabilities are entitled to a full and individual evaluation under IDEA.  *Id.* § 1412(a)(7), 20 U.S.C. §§ 1414(a)-(b).  IDEA additionally mandates that school districts that offer and provide RTI must provide appropriate research-based interventions.  20 U.S.C. § 1414(b)(6)(B); 34 C.F.R. § 300.309(a)(2)(i).  The rate of the student's progress in these interventions may be used as a part of the identification, referral and evaluation process.  34 C.F.R. §§ 300.309(b)(1)-(2); Cal. Code Regs. tit. 5 §§ 3030(b)(10)(C)(4)(i)-(ii) (2017).  Upon evaluation and determination of eligibility

for special education and related services, IDEA mandates the development and subsequent monitoring of a specially designed IEP to ensure that appropriate educational services, including specialized instruction, such as appropriately intensive research-based reading interventions, related services, supplementary aids and services, based on peer-reviewed research to the extent practicable; accommodations and modifications, AT and accessible materials are provided to students with disabilities as needed to ensure a FAPE in the LRE.  20 U.S.C. § 1414(d).  Child and parental input is required to be taken into account.  *Id*. § 1414 (a)(1)(D), (b); 34 C.F.R., Pt. 300.

167.    All Plaintiffs and Class Members are or may be a "child with a disability" because they (1) have or may have a SLD due to a reading disorder, including but not limited to dyslexia, and (2) need or may need special education and related aids and services.

168.    Defendants are the recipients of federal funds under the IDEA sufficient to invoke coverage under the IDEA.  20 U.S.C. § 1412(a).

169.    As set forth above, Defendants' policies and practices regarding students with SLDs due to a reading disorder constitute a persistent and systemic failure to meet the requirements of IDEA.

170.    Thus, Defendants have deprived each Plaintiff and have or may deprive Class Members of a FAPE in the LRE.

171.    As a direct and proximate result of Defendants' violations, each Plaintiff has suffered, and Class Members suffer or may suffer, irreparable harm, including substantial losses of educational opportunities.

172.    No administrative remedy exists under IDEA to address these wholesale violations by Defendants.

173.    Due to Defendants' ongoing violations of IDEA and implementing regulations, injunctive and declaratory relief are appropriate remedies.

174.    WHEREFORE, Plaintiffs pray for relief as set forth below.

///

///

**<u>Second Claim for Relief</u>**

**Violations of Section 504, 29 U.S.C. § 794, 34 C.F.R. Pt. 104**

**(On Behalf of All Plaintiffs, Class Members)**

175.    Plaintiffs incorporate the preceding paragraphs of this Complaint as if set forth in full herein.

176.    Section 504 provides in relevant part: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a); *see* 34 C.F.R. §§ 104.4(b), .21, .43(a).

177.    Section 504 mandates that a student who is eligible for special education and related aids and services under Section 504 is entitled to receive FAPE.  34 C.F.R. § 104.33.

178.    All Plaintiffs are and Class Members are or may be qualified individuals with disabilities within the meaning of Section 504 and are or may be otherwise qualified to participate in or receive benefits from Defendants' programs or activities.  29 U.S.C. § 794(a).

179.    Defendants have been and are a recipient of federal financial assistance sufficient to invoke the coverage of Section 504.  *Id.* § 794(b)(3).

180.    As set forth above, Defendants' policies and practices regarding students with learning disabilities due to a reading disorder constitute a persistent and systemic failure to meet the requirements of Section 504 and discriminate against all Plaintiffs and Class Members, solely by reason of their disability in violation of Section 504.

181.    Thus, Defendants have deprived each Plaintiff and have or may deprive Class Members of a FAPE.

182.    As a direct and proximate result of Defendants' violations, Plaintiffs have suffered, and Class Members suffer or may suffer, irreparable harm, including substantial losses of educational opportunities.

183.    Due to Defendants' ongoing violations of Section 504 and implementing regulations, injunctive and declaratory relief are appropriate remedies.

184.     WHEREFORE, all Plaintiffs and Class Members pray for relief as set forth below.

**Third Claim for Relief**

**Disability Discrimination - Failure to Accommodate in Violation of Title II of the ADA**

**42 U.S.C. §§ 12131 *et seq.*, 28 C.F.R. § 35.130**

**(On Behalf of All Plaintiffs, Class Members)**

185.     Plaintiffs incorporate the preceding paragraphs of this Complaint as if set forth in full herein.

186.     Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by such entity."  42 U.S.C. § 12132; *see* 28 C.F.R. §§ 35.130(a), (b)(1)-(3), (b)(7)-(8), (d).

187.     The requirements regarding the provisions of a FAPE, specifically described in Section 504 regulations, are incorporated in the general non-discrimination provisions of the applicable ADA regulation.  28 C.F.R. § 35.130(a).

188.     Each Defendant is either a public entity subject to Title II of the ADA or an official responsible for supervising the operations of a public entity subject to Title II of the ADA.  42 U.S.C. § 12131(1).

189.     All Plaintiffs are and Class Members are or may be qualified individuals with disabilities within the meaning of Title II of the ADA and meet the essential eligibility requirements for the receipt of services, programs, or activities of Defendants.  *Id.* § 12131(2).

190.     As set forth above, Defendants' policies and practices regarding students with learning disabilities due to a reading disorder constitute a persistent and systemic failure to meet the requirements of Title II of the ADA and discriminate against all Plaintiffs and Class Members, solely by reason of their disability in violation of requirements of ADA by denying all Plaintiffs and Class Members an equal and equally effective educational opportunity in the most integrated setting appropriate, and instead providing all Plaintiffs and Class Members with a separate, different, and inferior educational experience.

///

1    191.    Thus, Defendants have deprived each Plaintiff and have or may deprive Class

2    Members of a FAPE.

3    192.    As a direct and proximate result of Defendants' violations, Plaintiffs have

4    suffered, and Class Members suffer or may suffer, irreparable harm, including substantial losses

5    of educational opportunities.

6    193.    Due to Defendants' ongoing violations of Title II of the ADA and implementing

7    regulations, injunctive and declaratory relief are appropriate remedies.

8    194.    WHEREFORE, Plaintiffs pray for relief as set forth below.

9    **Fourth Claim for Relief**

10   **Violations of Cal. Educ. Code §§ 56000 *et seq.*, Cal. Code Regs. tit. 5 §§ 3030 *et seq.***

11   **(On Behalf of All Plaintiffs, Class Members)**

12   195.    Plaintiffs incorporate the preceding paragraphs of this Complaint as if set forth in

13   full herein.

14   196.    California law requires that "[a] child shall qualify as an individual with

15   exceptional needs . . . if the results of the assessment as required by [the] Education Code . . .

16   demonstrate that the degree of the child's impairment as described in subdivisions (b)(1) through

17   (b)(13) requires special education in one or more of the program options authorized by [the]

18   Education Code."  Cal. Code Regs. tit. 5 § 3030(a) (2017).  The law further explains that,

19   "Specific learning disability means a disorder in one or more of the basic psychological processes

20   involved in understanding or in using language, spoken or written, that may have manifested

21   itself in the imperfect ability to listen, think, speak, read, write, spell, or do mathematical

22   calculations, including conditions such as perceptual disabilities, brain injury, minimal brain

23   dysfunction, ***dyslexia***, and developmental aphasia.  The basic psychological processes include

24   attention, visual processing, auditory processing, sensory-motor skills, cognitive abilities

25   including association, conceptualization and expression."  *Id*. § 3030(b)(10) (emphasis added).

26   197.    All Plaintiffs are and Class Members are or may be students with "exceptional

27   needs" within the meaning of California regulations.  *Id*. § 3030(b).

28   ///

198.   Defendants are responsible for providing public education to BUSD students, including all Plaintiffs and Class Members.

199.   As set forth above, Defendants have denied students of a FAPE in the LRE.

200.   As a direct and proximate result of Defendants' violations, Plaintiffs have suffered, and Class Members suffer or may suffer, irreparable harm, including substantial losses of educational opportunities.

201.   Thus, Defendants have deprived each Plaintiff and have or may deprive Class Members of a FAPE in the LRE.

202.   As a direct and proximate result of Defendants' violations, Plaintiffs have suffered, and Class Members suffer or may suffer, irreparable harm, including substantial losses of educational opportunities.

203.   Due to Defendants' ongoing violations of the California Education Code Section 56000 *et seq.* and implementing regulations, injunctive and declaratory relief are appropriate remedies.

204.   WHEREFORE, Plaintiffs pray for relief as set forth below.

**Fifth Claim for Relief**

**Declaratory Relief**

**(On Behalf All Plaintiffs, Class Members)**

205.   Plaintiffs incorporate the preceding paragraphs of this Complaint as if set forth in full herein.

206.   As set forth above, an actual controversy has arisen and now exists between the parties in that all Plaintiffs and Class Members contend, and Defendants deny, that Defendants maintain policies and practices that discriminate against students with and suspected to have reading disorders and deprive them of a FAPE in the LRE, and that Defendants routinely fail to comply with the requirements of IDEA, 20 U.S.C. §§ 1400 *et seq.*, and its implementing regulations; Section 504, 29 U.S.C. § 794, and its implementing regulations; Title II of the ADA, 42 U.S.C. §§ 12132 *et seq.*, and its implementing regulations; and California Education Code Sections 56000 *et seq.* and its implementing regulations.

207. A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and act accordingly.

208. Wherefore, Plaintiffs request relief as set forth below.

## PRAYER FOR RELIEF

209. An order certifying this case as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(2) appointing Plaintiffs as Class Representatives of the Classes and their attorneys as Counsel for all Classes.

210. Declare that Defendants' policies, procedures, and practices regarding students with and who are suspected to have reading disorders violate the rights of all Plaintiffs and Class Members, under IDEA, Section 504, ADA, and Section 56000.

211. Issue preliminary and permanent injunctions pursuant to IDEA, Section 504, ADA, and Section 56000 that enjoin Defendants, their successors in office, agents, employees and assigns, and all persons acting in concert with them to promulgate compliant policies, procedures and practices.

212. Order Defendants to:

    1. Immediately take action to reform policies, procedures and practices to fully comply with IDEA, Section 504, ADA and Section 56000, including with respect to the RTI program that serves all students in BUSD. Create a new Board of Education-approved policy statement acknowledging the rights of students with reading disorders, outlined above, summarizing policy reforms, and reasserting Defendants' commitment to honor those rights. Broadly disseminate the Board of Education-approved policy statement as part of effective outreach plan;

    2. Immediately discontinue all policies, procedures and practices that do not comply with the laws cited above;

    3. Provide for immediate and continuing education and evaluation of progress toward compliance by qualified third-party experts. Experts should provide training to all BUSD staff outlining all of the above legal requirements:

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF     CASE NO. 3:17-cv-2510

1    "Child Find," RTI, universal screening, evaluation/identification,

2    appropriate research-based reading intervention services, related services,

3    supplementary aids and services, accommodations and modifications,

4    including but not limited to AT and accessible materials, for students with

5    reading disorders.  Experts should also provide program evaluation

6    following implementation of reforms;

7    4.   Establish appropriate, peer-reviewed research programs to the extent

8    practicable or other evidence-based programs that are necessary to provide a

9    FAPE in the LRE to students with reading disorders;

10   5.   Commit to identifying staff responsible for any violations of the laws cited

11   above for re-training, follow-up review, and appropriate disciplinary action;

12   6.   Develop a "practical method" to carry out "Child Find" duties and identify

13   all students with suspected reading disorders.  Offer complete evaluations of

14   these students in compliance with IDEA, Section 56000 and Section

15   504/ADA; and

16   7.   Through a fully compliant process that affords procedural safeguards to

17   students with disabilities and their parents, offer and provide a FAPE in the

18   LRE as appropriate to all students found eligible in accordance with IDEA,

19   Section 56000 and Section 504/ADA.

20   213.   An order awarding Plaintiffs reasonable attorneys' fees, costs, and disbursements,

21   as authorized by law; and

22   214.   For such other and further relief as this Court may deem just and proper.

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1    DATED:  May 2, 2017                    Respectfully submitted,

2

3                                           By:  /s/ Larisa Cummings
                                                 ARLENE B. MAYERSON (SBN 79310)
4                                                amayerson@dredf.org
                                                 LARISA CUMMINGS (SBN 131076)
5                                                lcummings@dredf.org
                                                 RAMAAH SADASIVAM (SBN 267156)
6                                                rsadasivam@dredf.org
                                                 DISABILITY RIGHTS EDUCATION
7                                                AND DEFENSE FUND, INC.
                                                 Ed Roberts Campus
8                                                3075 Adeline Street, Suite 210
                                                 Berkeley, CA 94703
9                                                Tel: +1.510.644.2555
                                                 Fax: +1.510.841.8645
10

11                                          By:  /s/ Deborah Jacobson
                                                 DEBORAH JACOBSON (SBN 278104)
12                                               djacobson@jacobsoneducationlaw.com
                                                 JACOBSON EDUCATION LAW, INC.
13                                               1919 Addison Street, Suite 105
                                                 Berkeley, CA 94704
14                                               Tel: +1.510.647.8125
                                                 Fax: +1.510.280.9340
15

16

17                                          By:  /s/ Shane Brun
                                                 SHANE BRUN (SBN 179079)
18                                               sbrun@goodwinlaw.com
                                                 BRENDAN E. RADKE (SBN 275284)
19                                               bradke@goodwinlaw.com
                                                 ANJALI MOORTHY (SBN 299963)
20                                               amoorthy@goodwinlaw.com
                                                 GOODWIN PROCTER LLP
21                                               Three Embarcadero Center
                                                 San Francisco, CA 94111
22                                               Tel: +1.415.733.6000
                                                 Fax: +1.415.677.9041
23
                                                 Attorneys for Plaintiffs
24

25

26

27

28

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF        CASE NO.  3:17-cv-2510

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues triable by jury in the above entitled action.

DATED:  May 2, 2017                    Respectfully submitted,


                              By:  /s/ Larisa Cummings
                                  ARLENE B. MAYERSON (SBN 79310)
                                  *amayerson@dredf.org*
                                  LARISA CUMMINGS (SBN 131076)
                                  *lcummings@dredf.org*
                                  RAMAAH SADASIVAM (SBN 267156)
                                  *rsadasivam@dredf.org*
                                  **DISABILITY RIGHTS EDUCATION
                                  AND DEFENSE FUND, INC.**
                                  Ed Roberts Campus
                                  3075 Adeline Street, Suite 210
                                  Berkeley, CA 94703
                                  Tel: +1.510.644.2555
                                  Fax: +1.510.841.8645


                              By:  /s/ Deborah Jacobson
                                  DEBORAH JACOBSON (SBN 278104)
                                  *djacobson@jacobsoneducationlaw.com*
                                  **JACOBSON EDUCATION LAW, INC.**
                                  1919 Addison Street, Suite 105
                                  Berkeley, CA 94704
                                  Tel: +1.510.647.8125
                                  Fax: +1.510.280.9340


                              By:  /s/ Shane Brun
                                  SHANE BRUN (SBN 179079)
                                  *sbrun@goodwinlaw.com*
                                  BRENDAN E. RADKE (SBN 275284)
                                  *bradke@goodwinlaw.com*
                                  ANJALI MOORTHY (SBN 299963)
                                  *amoorthy@goodwinlaw.com*
                                  **GOODWIN PROCTER LLP**
                                  Three Embarcadero Center
                                  San Francisco, CA 94111
                                  Tel: +1.415.733.6000
                                  Fax: +1.415.677.9041

                                  *Attorneys for Plaintiffs*

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF          CASE NO. 3:17-cv-2510

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTORNEY ATTESTATION**

I hereby attest, pursuant to Local Rule 5-1(i)(3), that I obtained the concurrence in the filing of this document from the signatories indicated by the conformed (/s/) of Larisa Cummings and Deborah Jacobson.

/s/ Shane Brun
SHANE BRUN